RECEIVED
SDNY PRO SE OFFICE

2023 FEB -7 PM 3:08

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Evgeny RYZHOV

*Plaintiff*

-v-

$5,379,876.94 IN UNITED STATES
CURRENCY FORMERLY ON DEPOSIT IN
SUNFLOWER BANK, N.A. ACCOUNT
1101996560, HELD IN THE NAME OF "OFAC
BLOCKED ACCOUNT MALOFEYEV";

KONSTANTIN MALOFEYEV,

TSARGRAD TV

*Defendants*

_____/

## COMPLAINT

Plaintiff Evgeny Ryzhov ("Ryzhov"), for his verified Complaint against Defendants, alleges, upon information and belief, as follows:

## INTRODUCTION

1. In 2014, Russian authorities began persecuting Ryzhov for his human rights and advocacy activities, resulting in his abduction and hostage-taking in June 2015, but Ryzhov managed to escape and resettle in the United States, where he was granted asylum.

2. Simultaneously with the politically motivated persecution, a group of high-ranking corrupt officials (the "Group") joined in the persecution of Ryzhov to extort and steal Ryzhov's property, including the property of his US companies. The Group used fraud, intimidation, extortion, torture, etc., much of which took place in the United States, to achieve its illicit goals. One of the tools of intimidation, extortion, torture, and concealment of the crimes committed was the smear campaign against Ryzhov, which included the creation of false and defamatory publications and their distribution around the world, including the United States. This campaign was aimed at destroying Ryzhov's reputation, torturing him, and interfering, bleeding dry and destroying his interstate law and investment businesses. This smear campaign was implemented through Konstantin Malofeyev, and his media resources, including Tsargrad TV, who in 2017-2018 created an association-in-fact, or RICO Enterprise, with the Group.

1

3.   The Group and its accomplices, including Malofeyev, Tsargrad TV divided the assets stolen from Ryzhov and deposited them in various bank accounts around the world, including banks in the United States.

4.   On February 02, 2023, Ryzhov learned that the Manhattan Federal Court entered an order allowing the prosecutor's office to confiscate $5.4 million from Malofeyev (case 1:22-cv-10148-JMF, SDNY 2023). Plaintiff believes that he is entitled to a portion of the monies because the funds stolen from him and the proceeds of the stolen assets are contained in this money and that a portion of this amount should be due to Ryzhov as compensation for Defendants' illicit acts.

## THE PARTIES

### A. The Plaintiff

5.   EVGENY RYZHOV ("Ryzhov"), the plaintiff, is a resident of Miami-Dade County, FL, an individual over the age of 18, a human right activist and licensed attorney in Russia, and a certified foreign legal consultant in the US, engaged in interstate and foreign law and investment businesses. Since 2014, Plaintiff has been persecuted by Russian authorities for his human rights and advocacy activities, including his open stance on Russian violations of international laws, including the 2014 invasion of Ukraine. Plaintiff is not only persecuted by the State for his activities but is also persecuted by a group of highly corrupt Russian officials and those close to them "businessmen" and "businesses" such as Defendants here, conducting their criminal affairs around the world and seeking to defraud Plaintiff. Ryzhov's dwelling address is 250 174th Str. Apt.1918, Sunny Isles Beach, FL 33160, USA, E.Ryzhov@yahoo.com, +7(910) 7971688.

### B. The Defendants

6.   $5,379,876.94 in United States currency formerly on deposit in Sunflower Bank, N.A. Account 1101996560, held in the name of "OFAC Blocked Account Malofeyev" (the "Defendant-in-rem").

7.   KONSTANTIN MALOFEYEV ("Malofeyev"), the defendant, is a Russian national who was at all relevant times the owner and managing partner of Marshall Capital Partners, which was a Russian

equity investment group. In accordance with the indictment brough by the US against Malofeyev to this Court, "on or about December 19, 2014, the United States Department of the Treasury"s Office of Foreign Assets Control ("OFAC") designated MALOFEYEV as a Specially Designated National ("SDN"). In so designating MALOFEYEV, OFAC explained that MALOFEYEV was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic."

8.  TSARGRAD OOO ("Tsargrad"), Russia-based company is a cornerstone of Malofeyev's broad malign influence network[1]. Tsargrad spreads pro-Kremlin propaganda and disinformation that is amplified by the Government of the Russian Federation ("GoR"). Tsargrad served as an intermediary organization between pro-Russian European politicians and GoR officials, and recently pledged to donate more than $10 million to support Russia's unprovoked war against Ukraine. Tsargrad was designated pursuant to E.O. 14024 for being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, Malofeyev.

**JURISDICTION AND VENUE**

9.  Jurisdiction is proper in this District as this case involves violations of Federal Law and thus involves federal questions and violations against a foreign citizen.

10. This Court has jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

---

[1] Malofeyev's Malign Influence Ecosystem, in accordance with the U.S. Treasury Designates Facilitators of Russian Sanctions Evasion, https://home.treasury.gov/news/press-releases/jy0731

11. Jurisdiction over Defendants is proper in this Court on the grounds that they conduct business within the United States and have been recognized to be under this Court's jurisdiction in previous litigations.

12. Also jurisdiction over Defendants is proper on the grounds that they were all co- conspirators who committed acts in furtherance of a conspiracy which they knew included acts in the United States, such as using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of the company, transferring threats and defamation statements.

13. Pursuant to 28 U.S.C. § 1332(a), "[a] case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (internal quotation marks and citation omitted).

14. Additionally, Rule 4(k)(2), Federal Rules of Civil Procedure, provides federal courts with personal jurisdiction over a foreign defendant "in federal question cases and if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." *See Eskofot A/S vs. EI Du Pont De Nemours & Company*, 872 F. Supp. 81 - Dist. Court, SD New York 1995.

15. Defendants are subject to this Court's personal jurisdiction under N.Y. C.P.L.R. §302(a) which provides that: "…a court may exercise personal jurisdiction over any non-domiciliary who, either "in person or through an agent": (i) "transacts any business within the state or contracts anywhere to supply goods or services in the state"; (ii) "commits a tortious act within the state"; (iii) "commits a tortious act without the state causing injury to person or property within the state ... if he [a] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or [b] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce"; or (iv) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. §302(a)(1)-(4).

16. "[C]ourts have explained that section 302 is a `single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir.2010) (internal quotation marks omitted); see also *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F.Supp. 433, 436 (S.D.N.Y.1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York as long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").

17. Foreign defendants can be subject to personal jurisdiction where another party "engaged in purposeful activities in the state ... with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit." *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988); see also *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

18. Venue is proper in this district for all Defendants pursuant to 28 U.S.C. §1391(c)(3), which authorizes an action against an alien in any district.  Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. §1391(b)(2) because substantial actions in furtherance of the conspiracy giving rise to Plaintiff's claims occurred in this District.

19. Jurisdiction and venue are thus proper.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

20. Plaintiff has been practicing law in Russia since 2005, and by 2009, his law firm had become one of the most prominent in the region in cases against "Reiderstvo," a type of illegal takeover, which in the 2000s became a *common modus* operandi in Russia. It is carried out through well-known techniques, including fraud, bribery, forgery, corruption, intimidation, and ultimately expropriation of the targeted company. Reiderstvo often involves private and public-sector white-collar criminals conspiring with state

organizations, including law enforcement agencies, as well as high level sitting politicians and their family members. *See* Dr. Louis Shelley and Judy Deane, *The Rise of Reiderstvo: Implications for Russia and the West* (2016).

21. One of Plaintiff's clients was Aquamarine LTD ("Aquamarine"), its shareholders, and its beneficiaries. Since 2005, the company has owned expensive premises located in the center of Moscow, Russia, which had been targeted by a group of high-ranking officials ("the Group"). Group has been trying to take over the premises illegally since 2007, but thanks to Ryzhov and his law firm, they managed to resist these attempts in the courts.

22. Around February 2015, Group bribed General Drymanov[2] and a number of police officers to create an agency relationship to carry out their criminal scheme, aimed mainly at taking over property under Ryzhov's control, including the premises above and his own assets[3]. On June 03, 2015, the illicit agency began to physically carry out its plan. On that day, the police officers abducted Ryzhov, took him hostage, and began extorting him to sign documents transferring his own and clients' property to the Group's members. However, Ryzhov managed to escape from the hostage-takers and flew abroad, so Group had to modify their scheme to achieve their overall goal. One such modification was to engage the Defendants

---

[2] One of the top officers of the Russian Investigation Committee, an official of much influence
During his carrier, Drymanov initiated politically motivated criminal cases "on the genocide of the Russian-speaking population of Donbas," to justify Russian involvement in the conflict and incitement of hatred against Ukraine in 2014. He repeatedly made false reports about the use of prohibited weapons by the Ukrainian army. He illegally instituted criminal proceedings against a captured Ukrainian pilot Nadezhda Savchenko and the commanders of the Ukrainian volunteer battalions Donbas, Aydar, and Dnipro-1. *See* https://www.spisok-putina.org/en/personas/drymanov-3/

[3] When Ryzhov left Russia, he had the following property: 1) Right to property, including real and intangible property held in a revocable Power Crown trust; 2) Right to income derived from the Power Crown trust; 3) Proprietary interest in the judgment debt of $656,308, entered by the court against Durandin; 4) Proprietary interest in conducting business in Russia, including legal and investment business; 5) Right to real property owned by Ryzhov, including apartments, houses and commercial real estate; 6) Right to income from the real estate listed in the preceding clause; 7) Proprietary interest arising from a liberty interest in the reputation, good name, and integrity of Plaintiff to practice law; 8) Rights to movable property, including ATV, snowmobile, firearms. The listed property was valued at a minimum of $5,000,000 at 2015 prices.

to achieve the Group's overall goal in exchange for a share of the illicit proceeds of the property stolen from Ryzhov.

23. As of June 2015, when Ryzhov left Russia, he had the following property: 1) Right to property, including real and intangible property held in a revocable Power Crown trust; 2) Right to income derived from the Power Crown trust; 3) Proprietary interest in the judgment debt of $656,308, entered by the court against Durandin, an active member of Group; 4) Proprietary interest in conducting business in Russia, including law and investment business; 5) Right to real property owned by Ryzhov, including apartments, houses and commercial real estate; 6) Right to income from the premises mentioned above; 7) Proprietary interest arising from a liberty interest in the reputation, good name, and integrity of Plaintiff to practice law; 8) Rights to movable property, including ATV, snowmobile, firearms. The listed property was valued at a minimum of $5,000,000 at 2015 prices. This property is an objective target for illegal taking over by Group, including Defendants, who constitute themselves an association-in-fact or RICO enterprise.

24. Group, acting through its company Equesman, and Plaintiff, representing his clients Aquamarine were involved in few real estate-related litigations that did not end in Groups's favor. The court judgements between Aquamarine and Equesman, as well as others where Plaintiff was involved as a lawyer or investor, had been published on the courts' websites and this was freely available online to anyone who wished to review the circumstances of the cases and how they were disposed. Wishing to depreciate the court decision Group initially, corrupted General Drymanov, who instituted a bogus criminal case against unknown persons, claiming that Equesman was a victim of fraud because it lost its cases against Aquamarine.

25. Further, while Ryzhov was in the United States, Group began to use the criminal case as an instrument of pressure. Group extorted ransom from Ryzhov in various forms, such as paying $3,000,000 in cash or signing documents transferring rights to his assets, otherwise threatening to initiate new bogus criminal cases or continue harassing Plaintiff, his family members, and his businesses. All of these acts

were accompanied by constant kill threats to Plaintiff and stealing of Plaintiff's property. See Case *Ryzhov v. Durandin et al* (1:2022cv20737, S.D. Fla).

26. When extortion failed and General Drymanov with his co-conspirators were arrested, Group conspired with Defendant Malofeyev, who embarked on a smear campaign against Plaintiff through his media, including Tsargrad.

27. On or about September 06, 2018, Malofeyev ordered Tsargrad to post a video reportage and an article *EVGENY RYZHOV'S BLACK CREDITORS* on the Internet, Tsargrad's website and other media under Malofeyev's control. That video and article contained many defamatory statements, accusing Plaintiff of committing numerous crimes himself and as a part of an organized crime group, committing numerous dishonest acts and so on. *See* Ryzhov Decl., ¶ 3. The exert of the article and video below:

"Simple arithmetic of the MFC [micro-financial company] owner Evgeny Ryzhov and his accomplices. Just a few manipulations with the borrower's credit contract, and someone else's dwelling is in his pocket"; "He concluded microloan contracts, gave people small amounts of money ..... Then ... changed the middle sheets of the contract, where the amount was specified. And when people came and reimbursed him for everything they took, he said: That's good, of course, but where's the rest of the money?"; "All in all, Evgeny Ryzhov owns 27 properties. Ryzhov placed marginal people in his apartments, which created unbearable living conditions for their former occupants."; "Ryzhov's vanity knows no boundaries. In his greed he spared no expense, and even had his eye on a fleet of garbage trucks belonging to a company that specializes in waste disposal"; "Ryzhov and Co. did not limit themselves to falsifying documents... Their methods of weaning went beyond the law and human morality. "They had pressure methods on me and my family like in the wild 90s," uttered Mr. Durandin. - On February 23rd they congratulated me on the holiday by hanging a grenade with a string from the gate of my house, which turned out to be a training grenade, but it did tickle my nerves. Because before that there had been SMS of different threatening kind - "give it back to me and we'll leave you alone, but you also have children and grandchildren - keep in mind" and "reveling in impunity, the ambitious Mr. Ryzhov decided to take the capital. The black creditor took a swing at a three-story building in the heart of Moscow, across from the Cathedral of Christ the Savior."; "When it's getting really tough, Ryzhov's heels blazed. He was captured on Sheremetyevo Airport's surveillance cameras, where he, yawning, strides through the terminal building with a small gym bag on his shoulder, passes through security, and follows to the boarding gate. Half an hour later, the plane will take him to the sunny shores of Miami"; "Being on an international wanted list, Ryzhov continues to run his OCG [organized crime group] from Miami"; "A shocking story. We feel sorry for the people who got in the way of Evgeny Ryzhov... Meanwhile, the courts of Nizhny Novgorod sided with the black creditor for eight years, stamping one after another dismissal of civil lawsuits."

Additionally, that video reportage used Ryzhov's own video, which was stolen from his laptop or cloud account, and he had never permitted Tsargrad or someone else to use it publicly.

28. On or about September 23, 2018, through Facebook, Plaintiff contacted Elena Sharoykina ("Sharoykina"), the CEO of Tsargrad, and demanded to remove that defamatory video and article because they caused his moral suffering and also caused damages to his business reputation.

29. On or about September 25, 2018, Plaintiff had a phone conversation with Sharoykina and again demanded Tsargrad remove that defamatory video and article. In response, she offered to submit Plainitt's demand to Tsargrad's email to discuss it with Malofeyev. Plaintiff followed the offer and sent his demand on the same day.

30. On or about September 28, 2018, Plaintiff received a reply from Tsargrad, refusing to remove the video and article.

31. On October 11, 2018, Malofeyev ordered Tsargrad to post another article *A WARM PLACE: THE U.S. WELCOMED THE FRAUDSTER RYZHOV WITH PRISON* on the Internet, Tsargrad's website and other media under Malofeyev's control. This article repeats the slanderous statements from the September 06, 2016 article and also carried threats of life imprisonment. *See* Ryzhov Decl., ¶ 9. The exert of the article below.

> "Evgeny Ryzhov, a lawyer from Nizhny Novgorod, who escaped to the United States from criminal prosecution for real estate fraud, spoke at a forum of "political refugees." He complained about his difficult fate, his imprisonment in a US prison, persecution by Russian authorities, and Interpol.
> Tsargrad previously covered a large-scale scheme by Evgeny Ryzhov, which gives him every right to be considered one of the most successful swindlers in Russia in recent times. In the disposal of TV channel there are materials of criminal case initiated against the fugitive lawyer. Despite the commencement of the investigation, Ryzhov managed to escape responsibility and hide in the US.
> The lawyer there plans to make a good fortune with his capital. Until that happens, he is active in the media, taking part in various forums and meetings where he talks about his difficult fate and allegedly unfounded persecution by the Russian authorities.
> The paradox of the situation is that "normal" criminal elements prefer to lie low and not stir the waters. Ryzhov, on the other hand, tries to make more noise. ... On October 9 (the night of October 10, Moscow time) in Miami, Evgeny Ryzhov spoke at a meeting called

"Business Refugees from Russia - Problems and Solutions" organized by Rubic, a publication devoted to contemporary immigration to the United States. At the meeting, the successful businessman and lawyer tried on the mask of an innocent convicted hero who, for some reason, is persecuted in Russia for "political reasons" when he steals millions.

**"U.S. Authorities Show Concern."**

The discussion was moderated by Ekaterina Panova, editor-in-chief and founder of the Rubic portal. In her opening remarks, she ironically stated that she was happy to introduce the audience to "select criminals, according to the Kremlin and Russian propaganda. The moderator stressed that she herself was Ukrainian, had never lived in Russia, and on that very basis claimed to be objective.

When the microphone was passed to Ryzhov, he told his story. The lawyer's speech, of course, did not include his microfinance organization, through fake contracts with which he "snatched" apartments from Nizhny Novgorod residents and put them on the street, nor did it mention the attempt to seize the sanatorium "Automobilist" and other similar cases.

But Ryzhov talked about the conflict he had with the former head of the State Investigative Committee for Moscow, Alexander Drymanov, who has already been arrested in Russia on charges of corruption. At the same time, Ryzhov noted that he himself was not guilty of anything, just someone very much wants to take real property from his former clients.

According to Ryzhov's version, Drymanov allegedly ordered his abduction. The lawyer managed to escape via the fire escape, then made his way to Europe, and from there, to the United States. There, however, he did not receive a very warm welcome: he was arrested and imprisoned.

…

Ryzhov's gang enlisted the help of bailiffs, who came to "help seize" the property with a group of 15 special forces.

The ability of fugitives like Ryzhov to portray themselves as victims is amazing! And the U.S. willingly believes in the trend of political prisoners who are imprisoned because of "Kremlin slanders" and persecuted abroad.

We can only hope that the U.S. will really look into Ryzhov's case and return him to the "high-security pioneer camp" or, better yet, extradite him to Russia to face punishment. This would show Interpol and the world at large that the U.S. legal system is doing its job well, and not just covering up for hardened criminals.

In Russia, Ryzhov could face up to 10 years in prison under the article on fraud. However, it is possible that the investigation will still see signs of criminal association in his actions. For this article 210 of the Criminal Code provides even harsher punishment, which is adequate to the greed and indifference to the fate of people deceived by Ryzhov. Under this article, one of the biggest swindlers of the last decade in Russia can go to jail for life.

32. As Tsargrad itself claimed in July 2016, its audience was 38.5 million viewers, and after the launch in 2017 of live streaming broadcasts in the channel's official social media groups: Facebook, VKontakte, and YouTube, the reach has grown by 440 percent, that is, to about 150 million viewers per month. At the same time, Malofeev expressed confidence that Tsargrad_Tv's audience will continue to grow: "Russian

World reaches hundreds of millions of people in Russia and beyond. The channel's staff work daily to make sure that it is interesting to everyone who considers themselves Russian anywhere in the world." Then, Malofeyev Further, Malofeev began publishing defamatory publications against Plaintiff through his other numerous online media outlets in order to avoid direct association with his name. The total number of such negative publications reached about 1,000,000.

33. By engaging in the conduct set forth above, Defendants intentionally, maliciously and irreparably damaged Ryzhov's reputation, personally and professionally.

34. The content of Defendant article and video's expressions are false and mainly have been held to be false by court decisions which entered in force and approved the collection proceedings in which Sheindlin engaged.

35. Defendants acted with actual malice in that they acted with knowledge that the statements were false or with reckless disregard of whether they were false or not.

36. Defendants, acting in conspiracy with Group, maliciously motivated to extort monies from Ryzhov by tarnishing the reputation of his good name.

37. Absent entry of a temporary restraining order, followed by preliminary and permanent injunctive relief, Defendants will continue to engage in a campaign of defamation against Ryzhov.

### COUNT I: DEFAMATION PER SE
### (Against Defendant Tsargrad)

38. Plaintiff incorporates paras. 27-31 as if fully set forth herein.

39. Under New York law, a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability.

40. Tsargrad's is liable for defamation because Tsargrad published (1) written false statements that tended to expose Ryzhov to public contempt, hatred, ridicule, aversion, or disgrace, (2) published it

without privilege or authorization to a third party, (3) amounting to fault as judged by, at a minimum, a negligence standard, and (4) Tsargrad's statements were false, and thereby (5) they constitute defamation *per se*.

41. Tsargrad committed defamation *per se* as its published statements charged Ryzhov with one or more serious crimes and tended to injure him in his trade, business and profession.

42. Tsargrad's September 06, 2018 published article on the Internet and video reportage on YouTube falsely claim that Ryzhov committed numerous crimes, including frauds, and was dishonest with his counterparties.

43. Said article and video, consisting of numerous false statements were published online and remain available for viewing by consumers of Internet YouTube.

44. Tsargrad's statements have exposed Ryzhov to public contempt, hatred, ridicule, aversion and disgrace as demonstrated by the public's comments on the Tsargrad website and websites which reposted the article and video.

45. Said statements by Tsargrad are categorically false as Ryzhov engaged in collection procedures or in transactions consistent with the Russian laws, which were confirmed by the Russian courts in adversary proceedings.

46. Publication of the identified statements constitutes defamatory *per se* as it accuses Ryzhov of the commission of serious crimes, acts of moral turpitude and tends to injure him in his trade, business and profession, as an attorney, which requires the confidence and trust of potential clients, actual clients, courts, colleagues and the general public.

47. Tsargrad's statements were repeatedly and maliciously uttered with knowledge of their falsehood.

48. Tsargrad's statements were made with actual malice and an intent to harm Ryzhov's reputation, as demonstrated by many factors, including that those statements contradict the courts' findings and conventional logic.

49. The content and circumstances underlying Tsargrad's defamatory statements constitute outrageous conduct, which is malicious, wanton, reckless and perpetrated in willful disregard for Ryzhov's rights, thus warranting punitive damages.

50. The events underlying this case, many of which are established as a matter of law and/or otherwise uncontroverted, constitute extraordinary circumstances and there is no adequate remedy at law which can mitigate and prevent further irreparable injury to Ryzhov except for an injunction requiring Tsargrad to remove any and all published by itself or disseminated of its articles that accuse plaintiff Ryzhov of stealing, fraud or any other criminal or unprofessional acts, and the injunction should prohibit Tsargrad from publishing any such statements on any medium in the future.

51. Tsargrad's unlawful conduct makes him liable to Ryzhov for compensatory and punitive damages in an amount exceeding $75,000.

**WHEREFORE,** Plaintiff prays that this Honorable Court [a] accept jurisdiction over this matter, [b] hear and decide this matter; [c] order Tsargrad to remove its statements about Ryzhov from the Internet including but not limited to from its website and YouTube through the present date; [d] temporarily, preliminarily and permanently enjoin Tsargrad from uttering, writing, publishing or otherwise spreading false statements concerning Plaintiff, his agents, assigns, those acting in concert with him or family members that in any way state or imply that Ryzhov engaged in unlawful, unethical or unprofessional conduct relating to all cases that have been adjudicated with Ryzhov's participation, [e] award Plaintiff compensatory damages for the embarrassment and other harms caused him by the referenced publications; [f] award plaintiff punitive damages for the malicious, wanton, reckless and willful violations of plaintiffs rights in which defendant has repeatedly engaged and [g] enter any other order for relief as required by law or equity, including the reasonable costs and disbursements arising from this litigation.

**COUNT II: Torture Victims Protection Act, 28 U.S.C. § 1350**
**(Against Defendant Malofeyev)**

52. U.S. Federal and State statutes prohibited acts of torture occurring within the United States.

53. Torture is defined in the Torture Victim Protection Act as (1) … any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering … , whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual … a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, … and (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from — (A) the intentional infliction or threatened infliction of severe physical pain or suffering; … (C) the threat of imminent death; or (D) the threat that another individual will imminently be subjected to death, ...

54. The U.S. Department of State annually reports that Russia has one the highest levels of significant human rights issues, including extrajudicial killings and attempted extrajudicial killings; enforced disappearances by or on behalf of government authorities; pervasive torture by government law enforcement officers that sometimes resulted in death; harsh and life-threatening conditions in prisons; widespread corruption at all levels and in all branches of government; while the government failed to take adequate steps to identify, investigate, prosecute, or punish most officials who committed abuses and engaged in corruption, resulting in a climate of impunity.

55. In 2018, Group hired or otherwise created an agency relationship with Malofeyev, a covert agent of Russian Government, and other state agents to use violence to intimidate Plaintiff in order to extort from him property of his clients and his own. Malofeyev and others were given specific direction by Group.

56. Defendant Malofeyev provided the members of Group his unlimited media sources for making repeated direct statements that Plaintiff's fate was already sealed by the Russian authorities and that it remained for them only to apprehend Plaintiff abroad and return him to Russia and subject him to

prolonged imprisonment. That is, having their unlimited influence in Russia, they did not have even the slightest doubt that court might decide otherwise. Virtually everyone knows, and numerous reports, including the U.S. Department of State's, confirm that if a person is imprisoned in Russia, they are 100% likely to be tortured. The numerous statements made by Defendant Malofeyev or other state agents, acting under the color of law, that have gone on for a long time, reached Plaintiff and caused him to sustain mental pain and suffering because the statements carried out clear and intended signals of threatened infliction of severe physical pain or suffering, the threat of imminent death to Plaintiff. Even being a considerable distance from Russia, Plaintiff could not feel safe because other government agents working in conspiracy with Defendants were and are presented and acted in the United States promoting Defendants' threats on US soil, and Plaintiff at that time and now, as a Russian citizen, remains within physical control of such agents.

57. Then, Defendant Malofeyev, acting in conspiracy with Group took action to deprive Plaintiff and his family of their livelihood in the United States, coming from Plaintiff's property in Russia. State agents, acting under color of law, demanded that Plaintiff's property be frozen so that he would either starve to death in the United States or crawl to Russia himself. Plaintiff, who had developed a heightened sensitivity because of the previous abducting and torture experience, experienced severe mental pain and anguish from the threat of imminent death for his family and himself.

58. In 2018, when one of the Defendants' main criminal partners, General Drymanov, was arrested on charges of extortion and patronage to leaders of the criminal underworld, and Plaintiff began giving numerous interviews to the international media, immediately after that, Plaintiff began receiving the threats of imminent death from Russian telephone numbers on his phone in the United States. Since Plaintiff indicated a direct link between Group and the General in those interviews, their direct interest is evident here.

59. Defendant Malofeyev was directly involved in the dissemination of the defamatory publications against Plaintiff, which number exceeds 1,000,000 and the numerosity of the publications constitutes torture itself because it leaves Plaintiff with no practical way to challenge them.

60. Plaintiff's mental anguish and suffering were exacerbated by the fact that all his attempts to complain about the Group's acts under the statutory procedure in Russia were in vain. The authorities, acting under the direction of Malofeyev, turned Plaintiff's complaints into a farce, such as refusing to adjudicate reports or complaints about the crimes committed against Plaintiff because they doubted the authenticity of Plaintiff's signature on the complaints or the powers of attorney issued to his attorneys; or because Plaintiff's rights were not violated by being a victim of crimes; or because the authorities declared Plaintiff wanted person, although they registered his domicile in the USA and sent him correspondence to his address, and so on, refusing to investigate or accept complaints for far-fetched reasons.

61. Thus, Plaintiff did and does not have access to an independent or functioning legal system within Russia to raise his TVPA claims. Any efforts by Plaintiff to seek redress were futile because "while the [Russian] government failed to take adequate steps to identify, investigate, prosecute, or punish most officials who committed abuses and engaged in corruption, resulting in a climate of impunity".

62. In 2019, the Miami Immigration Court ("IC") has adjudicated Plaintiff's asylum petition, in which Plaintiff had outlined Defendants' acts, including here, and IC found the actions constituted that Plaintiff was subjected to torture. Since the Defendant's assertations have reached IC and were adjudicated, Defendant Malofeyev is barred from contesting overwise under the doctrine of *res judicata.*

63. In *Franchise Tax Bd. of California v. Hyatt,* 538 U.S. 488, 123 S. Ct. 1683, 155 L. Ed. 2d 702 (2003) The Supreme Court of the United States held: "Full Faith and Credit shall be given in each … judicial Proceedings of every other State. … Whereas the full faith and credit command "is exacting" with respect to "[a] final judgment … rendered by a court with adjudicatory authority over the subject matter

and persons governed by the judgment," [*Baker v. General Motors Corp., 522 U.S. 222, 232,*] at 233, 118 S.Ct. 657,

64. By committing torture Defendant Malofeyev and his co-conspirators acted under the color of authority of the Russian government.

65. Citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp. 2d 633, 668 (S.D. N.Y. 2006), the Court in *Balcero* held that the standard for aiding and abetting is "(1) the principal violated international law; (2) the defendant knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation."[4] *Balcero* Order at 17.

66. As to the first element, Plaintiff has established in ¶¶ 52-60, *supra*, Defendant Malofeyev violated international law by committing torture himself or abetting and aiding to commit it state actors.

67. As to the second element, Plaintiff alleges that Defendant Malofeyev, had actual knowledge of what his acts could constitute torture and what effect they had on victim. However, Defendant Malofeyev not only failed to cease his illegal activity; but instead, he engineered, executed, and directed others to maximize the negative effect of torture on Plaintiff and his family.

---

[4] Although Plaintiffs address herein the higher standard adopted by *Balcero*, their position is that the binding standard for aiding and abetting was stated by the Eleventh Circuit in *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005) as: (1) "one or more of the wrongful acts that comprise the claim were committed," (2) the Defendants "substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim," and (3) Defendants "knew that [their] actions would assist in the illegal or wrongful activity at the time [they] provided the assistance." This test is virtually identical to that adopted by the RESTATEMENT (SECOND) OF TORTS, § 876(b). Further, under international law, a similar aiding and abetting standard of knowing, substantial assistance has been applied since at least the Nuremberg cases. See, e.g., *U. S. v. Friedrich Flick, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10* (1952).

68. As to the third element, when Defendant established an agency relationship with Group, he acted with the intent to torture Plaintiff in order to further their conceived extortion of property from Plaintiff as well as assist the members of Group to retaliate against him for their failures in the court proceedings.

69. As to the fourth element, Defendant' acts had a significant impact on the success of the overall criminal enterprise's goal, it became easily achievable without any possible resistance from Plaintiff. And Group reveled in its lust for revenge against Plaintiff, which they realized through the use of described torture, and the ruining of Plaintiff's reputation and his businesses in Russia.

70. As to the fifth and final element, Defendant was totally aware and publicly admitted that the acts assisted the specific torture alleged herein. As alleged above Defendant Malofeyev had actual knowledge of what actions could constitute torture, when directed his subordinate and state actors to threat Plaintiff in one way or another. The methods of operations were precisely what Defendant and his accompliciies expected to receive.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor and grant the following relief:

(1) An order granting Plaintiffs equitable relief, permanently enjoining Defendants Malofeyev from further engaging in human rights abuses against Plaintiff and other members of his family;

(2) An order awarding Ryzhov actual, punitive, and compensatory damages, as well as reasonable costs and attorney's fees; and

(3) Any other relief the Court deems just and equitable.

### COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant Malofeyev)

71. For more than eight years, Group, including Defendant Malofeyev, has engaged in an ongoing criminal enterprise to usurp Plaintiff's property and destroy him as a person for the Group members' own

unjust enrichment and sadistic satisfaction. In furtherance of their common goal, Group has committed various forms of unlawful acts against Plaintiff and his family, including abduction, extortion, fraud, stalking, threats to kill, bodily injury, and so on.

72. A claim for intentional infliction of emotional distress under New York law requires a plaintiff to establish: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). "[T]he rigor of the outrageousness standard is well established." *Lan Sang v. Ming Hai*, 951 F.Supp.2d 504, 530 (S.D.N.Y.2013) (internal quotation marks omitted). Specifically, the "[c]onduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," and recovery is only available "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." *Id.* (internal quotation marks omitted).

73. Defendant Malofeyev, being an active member of Group, has involved in pattern and practice of corruption, torture, threats, and intimidation of Plaintiff, to divest Plaintiff through recruiting state agents and mobsters, and the pattern and practice are outrageous.

74. Defendant Malofeyev's conduct in his continued attempts to assist group to abduct Plaintiff goes beyond all possible bounds of decency.

75. Defendant Malofeyev's conduct in threatening Plaintiff and his family goes beyond all possible bounds of decency.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment against Defendant Malofeyev in an amount of $1,000,000:

(1) For his willful and intentional infliction of emotional distress upon Plaintiff;

(2) In any other amount of damages to be determined at trial;

(3) Any other relief the Court deems just and equitable.

### COUNT IV: TRANSMITTING OF THREAT COMMUNICATIONS 18 U.S.C.A. § 875
### (Against Defendant Malofeyev)

76. As described above, between September and October 2018, Malofeyev, through his media outlets, acting in concert with Group, several times transferred Group's threats, which were summarized as follows: "You [Plaintiff Ryzhov] must transfer to the members of Group the property extorted from you. Otherwise, we are going to continue to harass and persecute you by commencing new bogus criminal cases and continuance of the smear campaign in the media or would send someone to the US to kidnap or kill you. Finally, they anyway take over your property. But if you give them what they want right now, you can freely return to Russia and save at least some of your assets." Plaintiff seriously apprehended the threats because in 2015, in Russia, he was abducted by police officers; then, in 2017, Group again attempted to abduct Plaintiff in the US, having misled US law enforcement and accompanied the attempt with repeated defamatory statements and threats in 2017 and 2018 in the online outlets belonged to Defendant Malofeyev.

77. 18 U.S.C.A. § 875(b) states "Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

78. 18 U.S.C.A. § 875(d) states "Whoever, with intent to extort from any person … any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee … or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned."

79. Here, Defendant Malofeyev's threatening communications contained true threats to injure Plaintiff himself or his reputation, which proved by the communications' context and under the circumstances in which they were transferred, where any reasonable person would foresee that the communications would

be interpreted as an expression of a serious intention to inflict bodily harm upon or to take the life of another individual.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Malofeyev:

(1) for his willful violation of Federal Law;

(2) in an amount of damages to be determined at trial;

(3) awarding Plaintiff any other relief deemed just and proper.

### COUNT V: LAUNDERING OF MONETARY INSTRUMENTS
### (Against Defendant Malofeyev)

80. 18 U.S.C. § 1956(a)(2) states:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part (i)to conceal or disguise the nature, the source, the location, the ownership, or the control of the proceeds of specified unlawful activity, ... shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.

81. Malofeev, being a member of Group, received a share of the assets stolen from Plaintiff and deposited them in the U.S. banking system, where they were frozen by the U.S. Attorney's Office case US v $5,379,876.94 in United States currency formerly on deposit in Sunflower Bank, N.A. Account 1101996560, held in the name of "OFAC Blocked Account Malofeyev" (No 1:22-cv-10148-JMF, S.D. NY).

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against all Defendant Malofeev:

(1) for his willful violation of Federal Law;

(2) in an amount of damages to be determined at trial;

(3) awarding Plaintiff any other relief deemed just and proper.

## COUNT VI: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970 ("RICO") - (18 U.S.C.A. §§ 1961 *et seq.*) (Against Defendant Malofeyev and Tsargrad)

82. Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

83. To state a claim under 18 U.S.C.A. §§1961 *et seq.*, a plaintiff must allege (1) that the defendant received money from a pattern of racketeering activity, (2) invested that money in an enterprise, (3) the enterprise affected interstate commerce, and (4) an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. See *Johnson v. GEICO Casualty Co.,* 516 F. Supp. 2d 351 (D. Del. 2007).

84. Defendants Malofeyev and Tsargrad have engaged in a "pattern of racketeering activity" as defined under 18 U.S.C. § 1962(c).

85. 18 U.S.C. §1962(c) states: *It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.*

86. Defendants Malofeyev and Tsargrad have engaged in at least two related acts of racketeering activity, including conspiracy with Group to extort Plaintiff's assets, and transmitting threatening communications to Plaintiff, and engineering and promoting a smear campaign against Plaintiff and his businesses with common goal to "take them down" and "destroy", and sharing illegal proceeds from the stollen Plaintiff's assets that amount to or have posed a threat of continued criminal activity. See 18 U.S.C. § 1341. "[F]or an association of individuals to constitute an enterprise," the Second Circuit has held, "the individuals must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." *Satinwood,* 385 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 820 F. Supp. 89, 98 (S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d Cir. 1994)) (emphasis

added). Following *Satinwood*, district courts in this Circuit have held that the common purpose element requires that the enterprise's members have had a common intent to violate RICO or to act unlawfully. Here, it is more than evident that Defendants had and have a common goal between them.

87. 18 U.S.C. §1341 states in relevant part: *Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.*

88. Defendants' acts consist of (1) a scheme or artifice to defraud; (2) use of the wire communications in furtherance of the scheme; and (3) intent to deprive Plaintiff of money, liberty, or property.

89. "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010).

90. Upon information and belief, Defendants and their agents, associates, and/or representatives communicated with one another in furtherance of their scheme to defraud via mail, e-mail and telephonic communications.

91. As a direct result of Defendants' wrongful conduct and purposeful actions under RICO, Plaintiff has been financially damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter an order:

(1) Finding that Defendants are in violation of The Racketeer Influenced and Corrupt Organizations Act of 1970;

(2) Finding that Defendants have engaged in a pattern of racketeering activity in furtherance of a scheme to defraud Plaintiff;

(3) Of Judgment against Defendants in the amount of damages to be determined at trial; and

(4) Awarding Plaintiff any other relief deemed just and proper;

**COUNT VII: CONSTRUCTIVE TRUST**
**(against $5,379,876.94 IN UNITED STATES CURRENCY FORMERLY ON DEPOSIT IN SUNFLOWER BANK, N.A. ACCOUNT 1101996560, HELD IN THE NAME OF "OFAC BLOCKED ACCOUNT MALOFEYEV")**

92. Plaintiffs re-allege and incorporate by reference the allegations set forth in each preceding paragraph as if rewritten herein.

93. Under 18 U.S.C.A. § 981 (a)(1) The following property is subject to forfeiture to the United States: (B) Any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense--(iii) would be punishable under the laws of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States. (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006,

1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

94. A constructive trust will be imposed "when property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 380–81 (1919). Generally, there are four requirements for the imposition of a constructive trust: (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment. *Sharp v. Kosmalski,* 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721, 723 (1976). Because the ultimate purpose of a constructive trust is to prevent unjust enrichment, however, these factors "are simply guidelines and their rigid application is not required." *Matter of Estate of Knappen,* 237 A.D.2d 677, 655 N.Y.S.2d 110, 111, *leave to appeal denied,* 90 N.Y.2d 802, 660 N.Y.S.2d 712, 683 N.E.2d 335 (1997). Even the complete absence of any fiduciary relationship between a debtor and a creditor does not automatically defeat a creditor's claim of constructive trust under New York law if otherwise required by equity. *In re Koreag, Controle et Revision, S.A.,* 961 F.2d 341, 353–54 (2d Cir.1992). Rather, a constructive trust may be imposed whenever necessary "to satisfy the demands of justice...." *Id.* "As with fraud, a constructive trust may be imposed on property obtained by bad faith." *In re Commodore Business Machines, Inc.,* 180 B.R. 72, 79 (Bankr.S.D.N.Y.1995).

Here, it is more than evident that Defendants had Here, the proceeds of $5,379,876.94 deposited in Sunflower Bank, N.A. Acc. 1101996560 ("Malofeyev Account") was obtained directly and indirectly through a pattern of racketeering activity running by Defendants Malofeyev and Tsargrad from Plaintiff, a foreign nation residing in the US. Thus, the proceeds are subject to a constructive trust.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter an order:

(1)     Subjecting $5,379,876.94 in United States Currency formerly deposited in Sunflower Bank, N.A. account 1101996560, held in the name of "OFAC blocked account Malofeyev" to the imposition of a constructive trust;

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all triable issues herein.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated February 4, 2023                          Respectfully submitted


By /s/

Evgeny RYZHOV

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Evgeny RYZHOV

*Plaintiff*

-v-

$5,379,876.94 IN UNITED STATES
CURRENCY FORMERLY ON DEPOSIT IN
SUNFLOWER BANK, N.A. ACCOUNT
1101996560, HELD IN THE NAME OF "OFAC
BLOCKED ACCOUNT MALOFEYEV";

KONSTANTIN MALOFEYEV,

TSARGRAD TV

*Defendants*

_____/

## DECLARATION OF EVGENY RYZHOV

I, Evgeny Ryzhov, declare and state as follows:

1.        I am the plaintiff ("Ryzhov" or "Plaintiff"), in the above captioned action. I submit this

Declaration, which is filed in support of Complaint against Defendants, an individual's property,

individual, individual's business entity (collectively "Defendants"). In accordance with my best personal

knowledge and belief regarding the matters set forth in this Declaration and, if called upon to do so, I

could and would competently testify to the following facts set forth below.

2.        I affirm that Konstantin Malofeyev owns Tsargrad and is the sole decision maker for the

launch of smear campaigns through his media, including Tsargrad.

3.        I affirm that on or about, with a Malofeyev's approval, on or about September 06, 2018,

Tsargrad posted a video reportage and an article EVGENY RYZHOV'S BLACK CREDITORS on the

Internet, its website, containing, among others, the following defamatory statements:

> "Simple arithmetic of the MFC [micro-financial company] owner Evgeny Ryzhov
> and his accomplices. Just a few manipulations with the borrower's credit contract, and
> someone else's dwelling is in his pocket"; "He concluded microloan contracts, gave people

small amounts of money ..... Then ... changed the middle sheets of the contract, where the amount was specified. And when people came and reimbursed him for everything they took, he said: That's good, of course, but where's the rest of the money?"; "All in all, Evgeny Ryzhov owns 27 properties. Ryzhov placed marginal people in his apartments, which created unbearable living conditions for their former occupants."; "Ryzhov's vanity knows no boundaries. In his greed he spared no expense, and even had his eye on a fleet of garbage trucks belonging to a company that specializes in waste disposal"; "Ryzhov and Co. did not limit themselves to falsifying documents... Their methods of weaning went beyond the law and human morality.  "They had pressure methods on me and my family like in the wild 90s," uttered Mr. Durandin. - On February 23rd they congratulated me on the holiday by hanging a grenade with a string from the gate of my house, which turned out to be a training grenade, but it did tickle my nerves. Because before that there had been SMS of different threatening kind - "give it back to me and we'll leave you alone, but you also have children and grandchildren - keep in mind" and "reveling in impunity, the ambitious Mr. Ryzhov decided to take the capital. The black creditor took a swing at a three-story building in the heart of Moscow, across from the Cathedral of Christ the Savior."; "When it's getting really tough, Ryzhov's heels blazed. He was captured on Sheremetyevo Airport's surveillance cameras, where he, yawning, strides through the terminal building with a small gym bag on his shoulder, passes through security, and follows to the boarding gate. Half an hour later, the plane will take him to the sunny shores of Miami"; "Being on an international wanted list, Ryzhov continues to run his OCG [organized crime group] from Miami"; "A shocking story. We feel sorry for the people who got in the way of Evgeny Ryzhov... Meanwhile, the courts of Nizhny Novgorod sided with the black creditor for eight years, stamping one after another dismissal of civil lawsuits."

> *See* Exhibit A

4.  I affirm that the video reportage used my own video, which was stolen from my laptop or cloud account, and I have never permitted Tsargrad or someone else to use it publicly.

5.  I affirm that on or about September 23, 2018, through Facebook, I sent a demand to Elena Sharoykina, the CEO of Tsargrad, to remove that defamatory video and article, because they caused moral suffering and also caused damage to my business reputation.

6.  I affirm that on or about September 25, 2018, I had a phone conversation with Elena Sharoykina and, one more time demanded Tsargrad remove that defamatory video and article. In response, she offered to submit my demand at press@tsargrad.tv to discuss it with Malofeyev.

7.  I affirm that on or about September 25, 2018, I submitted the requested demand at the email address.

8. I affirm that on or about September 28, 2018, I received a reply from Tsargrad, which refused to remove the video and article. *See* Exibit B.

9. I affirm that on October 11, 2018, with a Malofeyev's approval, Tsargrad published an article *A WARM PLACE: THE U.S. WELCOMED THE FRAUDSTER RYZHOV WITH PRISON* on the Internet, its website, containing among others, the following defamatory statements:

"Evgeny Ryzhov, a lawyer from Nizhny Novgorod, who escaped to the United States from criminal prosecution for real estate fraud, spoke at a forum of "political refugees." He complained about his difficult fate, his imprisonment in a US prison, persecution by Russian authorities, and Interpol.

Tsargrad previously covered a large-scale scheme by Evgeny Ryzhov, which gives him every right to be considered one of the most successful swindlers in Russia in recent times. In the disposal of TV channel there are materials of criminal case initiated against the fugitive lawyer. Despite the commencement of the investigation, Ryzhov managed to escape responsibility and hide in the US.

The lawyer there plans to make a good fortune with his capital. Until that happens, he is active in the media, taking part in various forums and meetings where he talks about his difficult fate and allegedly unfounded persecution by the Russian authorities.

The paradox of the situation is that "normal" criminal elements prefer to lie low and not stir the waters. Ryzhov, on the other hand, tries to make more noise. ... On October 9 (the night of October 10, Moscow time) in Miami, Evgeny Ryzhov spoke at a meeting called "Business Refugees from Russia - Problems and Solutions" organized by Rubic, a publication devoted to contemporary immigration to the United States. At the meeting, the successful businessman and lawyer tried on the mask of an innocent convicted hero who, for some reason, is persecuted in Russia for "political reasons" when he steals millions.

**"U.S. Authorities Show Concern."**

The discussion was moderated by Ekaterina Panova, editor-in-chief and founder of the Rubic portal. In her opening remarks, she ironically stated that she was happy to introduce the audience to "select criminals, according to the Kremlin and Russian propaganda. The moderator stressed that she herself was Ukrainian, had never lived in Russia, and on that very basis claimed to be objective.

When the microphone was passed to Ryzhov, he told his story. The lawyer's speech, of course, did not include his microfinance organization, through fake contracts with which he "snatched" apartments from Nizhny Novgorod residents and put them on the street, nor did it mention the attempt to seize the sanatorium "Automobilist" and other similar cases.

But Ryzhov talked about the conflict he had with the former head of the State Investigative Committee for Moscow, Alexander Drymanov, who has already been arrested in Russia on charges of corruption. At the same time, Ryzhov noted that he himself was not guilty of anything, just someone very much wants to take real property from his former clients.

According to Ryzhov's version, Drymanov allegedly ordered his abduction. The lawyer managed to escape via the fire escape, then made his way to Europe, and from there, to the United States. There, however, he did not receive a very warm welcome: he was arrested and imprisoned.

...

Ryzhov's gang enlisted the help of bailiffs, who came to "help seize" the property with a group of 15 special forces.

The ability of fugitives like Ryzhov to portray themselves as victims is amazing! And the U.S. willingly believes in the trend of political prisoners who are imprisoned because of "Kremlin slanders" and persecuted abroad.

We can only hope that the U.S. will really look into Ryzhov's case and return him to the "high-security pioneer camp" or, better yet, extradite him to Russia to face punishment. This would show Interpol and the world at large that the U.S. legal system is doing its job well, and not just covering up for hardened criminals.

In Russia, Ryzhov could face up to 10 years in prison under the article on fraud. However, it is possible that the investigation will still see signs of criminal association in his actions. For this article 210 of the Criminal Code provides even harsher punishment, which is adequate to the greed and indifference to the fate of people deceived by Ryzhov. Under this article, one of the biggest swindlers of the last decade in Russia can go to jail for life.

*See* Exhibit C

10.     I affirm that Defendants are reachable at 115093, Moscow, Partyny lane, 1, room 57, building 3, floor 1, room I, room 45, Tel.:+7 (495) 374-77-73, info@tsargrad.tv, press@tsargrad.tv

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 04th day of February 2023.

Evgeny Ryzhov
E.Ryzhov@yahoo.com
+7(910) 797 1688
250 174th apt. 1918,
Sunny Isles Beach, FL 33160

# Exhibit A

tsargrad.tv /articles/chjornye-kreditory-evgenija-ryzhova_156703

# Чёрные кредиторы Евгения Рыжова

Мария Иваткина ⋮⋮ 9/6/2018



Вы уверены, что ваша квартира принадлежит вам? Вопиющая история произошла в Нижнем Новгороде. 8 лет там орудовала банда чёрных кредиторов - выдавали займы, подделывали договоры, а затем вламывались в дома клиентов с документами на собственность.

Когда дом - больше не крепость, а поле битвы. Криминальный детектив развернулся в Нижнем Новгороде. Аккурат к ужину в квартиру местных жителей Тихоновых пожаловали незваные гости.

Человек в кипельно белых брюках, Евгений Рыжов, представился владельцем ¼ доли их жилплощади. Прибывшему на место участковому он рассказал, что сын Тихоновых взял кредит в его микрофинансовой организации, как водится, под залог квартиры. Деньги отдал, да не все. По решению суда квадратные метры перекочевали в его владение.

«Пацан, который учился в техникуме автотранспортном нижегородском, - рассказывает *пострадавшая **Светлана Тихонова**. -* Все тогда сдавали на права и покупали машины: А у нас не было денежек, чтобы ему какую-то машину купить. И вот он втайне от нас, раз мы ему не даем и не можем ему никак помочь, решил справиться сам – взять эти деньги».

Занял «пацан» 100 тысяч рублей, в срок вернул всю сумму. Однако остался должен еще полмиллиона. Простая арифметика владельца МФО Евгения Рыжова и его подельников. Всего несколько манипуляций с кредитным договором заёмщика, и чужая жилплощадь в кармане.

*Партнер юридического бюро «ТМ Дефенс»* **Олег Жуков** рассказал Царьграду: «Он заключал договоры на микрозаймы, выдавал людям небольшие суммы денег – порядка 100-200 тысяч рублей. Потом, как мы предполагаем, менял средние листы договора, где была указана сумма. И когда люди приходили и возмещали ему все, что они взяли, он говорил: это хорошо, конечно, а где оставшиеся деньги?».



Светлана Тихонова. Фото: Телеканал «Царьград»

В Нижнем Новгороде, где орудовала банда чёрных кредиторов, доказано 8 подобных эпизодов. Всего же у Евгения Рыжова значится в собственности 27 объектов недвижимости. Истории жилищных трагедий нижегородцев писались под копирку. На свои квадратные метры в чужих квартирах Рыжов селил людей маргинальной наружности, которые создавали невыносимые условия для жизни прежних обитателей.

«Хотел нас выселить, - жалуется Светлана Тихонова. - Он сказал: я подселю на свою долю каких-то там людей, с которыми вы жить не сможете и сами уйдёте. Сказал: кто вы такие? Всё равно я вашу квартиру заберу, а вы можете идти на улицу. Меня мало интересуют ваши проблемы».



https://youtu.be/EoB0D8OUQxg

Пенсионный фонд не откажется от своих дворцов, но уволит 25% сотрудников

Пострадавшая называет Рыжова «тщеславным человеком». «Безнаказанность у него на лице написана: для меня нет никаких преград, я всё могу. Что захочу, то и сделаю», - говорит Тихонова.

Тщеславие Рыжова не знает границ. В своей жадности он не брезговал ничем, и даже положил глаз на парк мусоровозов, принадлежащий компании, которая специализируется на утилизации отходов.

«Мы столкнулись с группой мошенников, - заявила *директор компании «Мой дом»* **Алёна Полозова.** - У нас пытались отобрать транспортные средства – машины-мусоровозы, которыми мы оказывали услуги по вывозу мусора. В одно прекрасное утро водители пришли на работу и не обнаружили на стоянке своих автомобилей. Это большая техника, которую нельзя положить в сумку и просто так унести со стоянки. Были написаны заявления в милицию, объявлен план-перехват, и спустя какое-то время машины были обнаружены на стоянке службы судебных приставов».



Мусоровоз компании «Мой дом». Фото: Телеканал «Царьград»

Со временем аппетиты Рыжова росли. В очередной раз его глаз упал на чужое - санаторий «Автомобилист», расположенный в сердце Нижегородской области, в тихом месте на берегу Волги.

*Собственник оздоровительного учреждения **Валерий Дурандин** рассказывает*: «Санаторий находится на живописном берегу реки Волги, на протоке. Напротив - очень красивый остров Телячий. Там сосново-дубовый лес. Рядом в лесу озеро очень чистое, 6,5 гектаров земли со всеми коммуникациями. Кусок очень лакомый. И я не удивляюсь, что на этот кусок был положен глаз».

Избавиться от этого злого глаза оказалось непросто. Рыжов и Ко фальсификацией документов не ограничивались. Методы отъёма выходили за рамки закона и человеческой морали.

«Методы давления у них были на меня и на мою семью как в лихие 90-е, - делится господин Дурандин. - На 23 февраля меня поздравили с праздником, подвесив к калитке моего дома гранату с растяжкой, которая впоследствии оказалась учебной, но нервы пощекотали. Поскольку до этого были SMS разного угрожающего свойства - «отдай подобру-поздорову и от тебя отстанем, а так – у тебя и дети есть, и внуки есть – имей в виду».

Упиваясь безнаказанностью, амбициозный господин Рыжов решил брать столицу. Чёрный кредитор замахнулся на трёхэтажное здание в самом сердце Москвы напротив Храма Христа Спасителя.

«Когда аппетиты перешли Нижний Новгород и стали более существенными, он с группой лиц решил захватить здание в Москве на Гоголевском бульваре, дом 3. Но на этом деле он и погорел», - отметил адвокат Олег Жуков.

Услышав запах жареного, Рыжов засверкал пятками. Это зафиксировали камеры видеонаблюдения аэропорта Шереметьево, где он, зевая, шагает по зданию терминала с небольшой спортивной сумкой на плече, проходит контроль и следует к выходу на посадку. Спустя полчаса самолёт умчит его к ласковым берегам Майами.



Евгений Рыжов. Фото: Телеканал «Царьград»

Бегство Рыжова положение пострадавших от его деяний не улучшило. Его последователи продолжили захват квартир.

Те, кто послабее, были вынуждены отступить. Незваные гости буквально выжили из собственной квартиры семью Солодеевых, которая состоит из трёх женщин – бабушки, мамы и внучки. Мужчины, который бы вступился за них, рядом не оказалось.

Семья Тихоновых, захват квартиры которых попал на видеозапись, свою жилплощадь отстояла. Правда, для того, чтобы откупиться от мошенников, пришлось влезть в долги.



https://youtu.be/TQV8cyc5jkU

Опасно: криптопирамиды чёрных кредиторов

«Мы выплатили те деньги, которые суд требовал с нас за нашу же квартиру. Мы выплатили, хотя для нас это огромная сумма – собрали со всех родственников и освободились, таким образом, от долга и от Рыжова. Мы отдали почти 500 тысяч рублей без малого, - сообщила Царьграду Светлана Тихонова. - Вариант, когда вы можете оказаться на улице голый и босой, без денег и без всего – не дай Бог никому!».

К помощи всевышнего взывает и руководство санатория «Автомобилист». Попытки его захвата продолжаются. Находясь в международном розыске, из Майами Рыжов продолжает руководить своей ОПГ. Но владелец санатория Валерий Дурандин дал слово и себе, и своему коллективу, что будет бороться до конца.

«Пока я эту землю топчу, санаторий будет санаторием», - заявил Дурандин.



Фото: www.globallookpress.com

Шокирующая история. По-человечески жаль людей, которые попались на пути Евгения Рыжова. Представьте, что в вашу квартиру вдруг вламываются неизвестные бугаи и сообщают, что теперь будут жить с вами. При этом суды Нижнего Новгорода на протяжении восьми лет вставали на сторону чёрного кредитора, штампуя один за другим отказные решения на иски граждан.

В распоряжение телеканала «Царьград» попали документы, в которых значится, что служители Фемиды отказали в проведении почерковедческой экспертизы по делу семьи Тихоновых, сын которых взял в кредит 100 тысяч, а стал должен 600. Безработный 18-летний мальчишка, почувствовавший вкус взрослой жизни. Как ему вообще был выдан займ?



ПОСТАНОВЛЕНИЕ
о признании потерпевшим

г. Нижний Новгород                    « 22 »    апреля    2016 г.
(место составления)

Следователь по особо важным делам второго отдела по расследованию особо важных дел следственного управления Следственного комитета Российской Федерации по Нижегородской области старший лейтенант юстиции Парамонов Е.В., рассмотрев материалы уголовного дела № 82493..,

УСТАНОВИЛ:

Настоящее уголовное дело возбуждено 22.04.2016 по признакам

преступления, предусмотренного ч. 4 ст. 159 УК РФ, по факту мошеннических действий неустановленных лиц, совершенных в отношении Тихонова Д.Н.

В ходе предварительного следствия установлено, что в один из дней мая 2009 года неустановленные лица из корыстных побуждений с целью приобретения права на имущество – ¼ доли квартиры, расположенной по адресу: г. Нижний Новгород, ул. Витебская, д. 6, кв. 8, путем обмана, изготовили договор займа с залоговым обеспечением и договор залога имущества, куда внесли не соответствующие действительности сведения о получении Тихоновым Д.Н. денежного займа в сумме 224 000 рублей, при этом заведомо влекущую неспособность последнего возвратить в полном объеме сумму займа, после чего 15.06.2009 склонили Тихонова Д.Н. к подписанию указанные договоры.

В связи с несостоятельностью выплаты займа в сумме 224 000 рублей, заведомо ложно указанной в договорах, право собственности на ¼ доли квартиры, расположенной по адресу: г. Нижний Новгород, ул. Витебская, д. 6, кв. 8, утрачено Тихоновым Д.Н. после регистрации перехода права собственности на основании постановления судебного пристава-исполнителя о передаче нереализованного имущества должника взыскателю 08.07.2013 и акта передачи нереализованного имущества должника взыскателю в счет погашения долга.

Полученной долей жилого помещения среднерыночной стоимостью 1 000 000 рублей, право на которое незаконно приобретено путем обмана, неустановленные лица распорядились по своему усмотрению.

На основании изложенного, и учитывая, что _____ Тихонову Д.Н. _____
(фамилия, имя, отчество лица, признанного потерпевшим)

причинен    имущественный вред _____

руководствуясь ст. 42 УПК РФ,

ПОСТАНОВИЛ:

Признать потерпевшим _____ Тихонова Дмитрия Николаевича, 26.10.1989 г.р. _____

по уголовному делу №          824931                        , о чем объявить

ему под расписку.

    Следователь

(подпись)





Сообщаю, что Ваше обращение по уголовному делу № 823428 прокуратурой области рассмотрено.

Установлено, что 11.04.2016 следователем СО по г. Дзержинску СУ СК России по Нижегородской области возбуждено уголовное дело № 825428 по признакам преступления, предусмотренного ч. 3 ст. 291 УК РФ, по факту свидетельства в деятельность Дзержинского городского суда.

В настоящее время уголовное дело находится в производстве второго отдела по расследованию особо важных дел СУ СК России по Нижегородской области, срок следствия продлен до 11.07.2016.

О результатах расследования заинтересованные лица будут уведомлены в установленном уголовно-процессуальным законодательством порядке.

Начальник 3 отдела управления по
надзору за уголовно-процессуальной
и оперативно-розыскной деятельностью
прокуратуры области

Д.В. Чиксин

Б  555778





Генеральная прокуратура
Российской Федерации

Директору ОАО
«Санаторий Автомобилист»

Дурандину В.Н.

пер. Охотский, д. 6,
г. Нижний Новгород, 603022

06.07.2016          15/2-2958-11

На №

     В Генеральной прокуратуре Российской Федерации рассмотрено Ваше об-
ращение о несогласии с постановлением об отказе в возбуждении уголовного
дела, вынесенным 01.04.2014 СО по г. Дзержинску СУ СК России по Нижего-
родской области, и по другим вопросам.
     Разъясняю, что указанное постановление 08.04.2016 отменено заместите-
лем прокурора Нижегородской области, и по результатам дополнительной про-
верки названным следственным органом 11.04.2016 возбуждено уголовное дело
о вмешательстве в деятельность суда. Расследование по уголовному делу кон-
тролируется.
     Для разрешения доводов о передаче в производство одного следственного
органа уголовных дел о неправомерных действиях адвоката Рыжова Е.В., рас-
следуемых СУ СК России по Нижегородской области и СУ по ЮАО ГСУ СК
России по г. Москве, копия настоящего обращения направлена по подведомст-
венности в Следственный комитет Российской Федерации.
     Также сообщаю, что заместителем Генерального прокурора Российской
Федерации Малиновским В.В. в адрес Председателя СК России направлено
повторное письмо о передаче упомянутых в Вашем обращении уголовных дел в
производство одного следственного органа.
     Представленные копии документов возвращаются.

Приложение: на 25 л.

Старший прокурор отдела управления
по надзору за процессуальной деятельностью
Следственного комитета
Российской Федерации                                        А.М. Тимербулатов

10/11

Микрофинансовая организация Рыжова как раз и делала ставку на пацанов и пенсионеров. Тех, на кого проще воздействовать. Махинатор Евгений Рыжов сейчас в Майами и, по всей видимости, не бедствует. Дело его живёт. Люди по-прежнему не могут избавиться от назойливых соседей. Не пора ли Генеральной прокуратуре страны обратить свое внимание на эту вопиющую историю?



Subscribe to DeepL Pro to translate larger documents.
Visit www.DeepL.com/pro for more information.

tsargrad.tv /articles/chjornye-kreditory-evgenija-ryzhova_156703

# Black creditors of Evgeny Ryzhov

Maria Ivatkina  :  : 9/6/2018



Are you sure your apartment belongs to you? A blatant story happened in Nizhny Novgorod. For eight years, a gang of black moneylenders had been operating there: they issued loans, forged contracts, a n d  then broke into clients' homes with property documents.

When a house is no longer a fortress, but a battlefield. A criminal detective story unfolded in Nizhny Novgorod. Right on time for dinner, uninvited guests came to the apartment of the local Tikhonovs.

The man in bubble-white pants, Evgeny Ryzhov, introduced himself as the owner of ¼ of their apartment. He told the district police officer who arrived that the Tikhonovs' son took a loan from his microfinance organization, as usual, against the security of the apartment. He paid back the money, but not all of it. According to the court's decision the square meters came into his possession.

"The kid who was studying at the Nizhny Novgorod Technical School of Motor Transport," says **Svetlana Tikhonova**, *the victim. -* Everybody was taking his license and buying cars back then. But we had no money to buy him a car. So secretly, since we don't give it to him and can't help him in any way, he decided to take the money himself.

The "kid" borrowed 100 thousand rubles and paid back the entire amount on time. However, he still owed another half million. Simple arithmetic of the MFI owner Evgeny Ryzhov and his accomplices. Just a few manipulations with the borrower's loan agreement, and someone else's living quarters are in their pocket.

**Oleg Zhukov,** *a partner at the law firm TM Defence,* told Tsargrad: "He made microloan contracts, gave people small amounts of money - about 100-200 thousand rubles. Then, as we assume, he changed the middle sheets of the contract, where the amount was specified. And when people would come and reimburse him for everything they had taken, he would say: That's good, of course, but where is the rest of the money?



Svetlana Tikhonova. Photo: Tsargrad TV channel

In Nizhny Novgorod, where the gang of black moneylenders was operating, 8 similar episodes were proven. All in all, Evgeny Ryzhov owns 27 properties. The stories of housing tragedies of Nizhny Novgorod residents were written by copy. Ryzhov moved people of marginal appearance to his apartments, which created unbearable living conditions for their former occupants.

He wanted to evict us," complained Svetlana Tikhonova. - He said: I'll move some people into my share that you can't live with and you'll leave. He said: Who are you? I'm going to take your apartment anyway, and you can go out on the street. I have little interest in your problems.



https://youtu.be/EoB0D8OUQxg

The Pension Fund will not give up its palaces, but will fire 25% of its employees

The victim calls Ryzhov a "vain man. "Impunity is written all over his face: there are no obstacles for me, I can do anything. Whatever I want, I can do," says Tikhonova.

Ryzhov's vanity knows no bounds. In his greed, he did not shy away from anything, and even had his eye on a fleet of garbage trucks owned by a company that specializes in waste disposal.

"We ran into a group of scammers," said *the director of My House,* **Alyona Polozova.**
- They tried to take away our vehicles, the garbage trucks that we used to provide garbage collection services. One fine morning, the drivers came to work and didn't find their vehicles in the parking lot. This is a lot of equipment that you can't put in a bag and just take away from the parking lot. They wrote statements to the police, announced an interception plan, and after some time, the cars were found in the parking lot of the bailiff service".



Garbage truck of the company "My House". Photo: Tsargrad TV channel

As time passed, Ryzhov's appetite grew. Once again his eye fell on someone else's - the sanatorium "Avtomobilist", located in the heart of the Nizhny Novgorod region, in a quiet place on the banks of the Volga.

**Valery Durandin**, *the owner of the sanatorium,* says: "The sanatorium is located on the picturesque bank of the Volga River, on the channel. Opposite it is a very beautiful island of Telyachy. There is a pine and oak forest there. Near the forest lake is very clean, 6.5 hectares of land with all communications. The piece is very tasty. And I am not surprised that this piece of land was laid eyes on.

Getting rid of this evil eye was not easy. Ryzhov and Co. did not limit themselves to falsifying documents. The methods of taking away went beyond the law and human morality.

"They had pressure methods on me and my family like in the dashing 90s," shares Mr. Durandin. - On February 23, they congratulated me on the holiday by hanging a grenade with a tension grenade against the gate of my house, which later turned out to be a training grenade, but it tickled my nerves. Because before that I had received various threatening SMSes - "Give it to me quickly and we'll get rid of you, but you also have children and grandchildren - keep in mind.

Reveling in impunity, the ambitious Mr. Ryzhov decided to take the capital. The black creditor took a swing at a three-story building in the heart of Moscow, across from the Cathedral of Christ the Savior.

"When his appetites went over Nizhny Novgorod and became more substantial, he and a group of people decided to seize a building in Moscow on Gogolevsky Boulevard, 3. But on this case he got burned," said lawyer Oleg Zhukov.

Hearing the smell of fried food, Ryzhov's heels blazed. This was captured on Sheremetyevo Airport's surveillance cameras, where, yawning, he strides through the terminal building with a small gym bag on his shoulder, passes through security and follows to the boarding gate. Half an hour later, the plane will whisk him away to the gentle shores of Miami.



Evgeny Ryzhov. Photo: Tsargrad TV channel

Ryzhov's flight did not improve the situation of the victims of his deeds. His followers continued to seize apartments.

The weaker ones were forced to retreat. Uninvited guests literally drove the Solodeevs family, which consists of three women - the grandmother, mother and granddaughter - out of their own apartment. There was no man to stand up for them.

The Tikhonov family, whose seizure of their apartment was caught on video, defended their living quarters. However, in order to pay off the crooks, they had to go into debt.



https://youtu.be/TQV8cyc5jkU

Dangerous: crypto pyramids of black lenders

"We paid the money that the court demanded from us for our own apartment. We paid, although it was a huge amount for us - we collected from all our relatives and thus got rid of the debt and Ryzhov. We have paid almost 500 thousand rubles," Svetlana Tikhonova told Tsargrad. - God forbid for anyone to be on the street naked and barefoot, without money and without anything!

The management of the sanatorium "Avtomobilist" also appeals to the Almighty. Attempts to seize it continue. Being on an international wanted list, Ryzhov continues to lead his OCG from Miami. But the owner of the sanatorium, Valery Durandin, gave his word both to himself and to his staff that he would fight to the end.

"As long as I trample this land, the sanatorium will be a sanatorium," Durandin declared.



Photo: www.globallookpress.com

Shocking story. I feel sorry for the people who got in the way of Evgeny Ryzhov. Imagine that unknown boogeymen suddenly break into your apartment and tell you that they are going to live with you now. At the same time, the courts of Nizhny Novgorod for eight years sided with the black creditor, stamping one after another rejected decisions on the claims of citizens.

The Tsargrad TV channel has obtained documents which show that justice officials refused to conduct handwriting expertise in the case of the Tikhonov family, whose son borrowed 100 grand and now owes 600. The unemployed 18-year old boy got a taste of adult life. How did he get the loan in the first place?



ПОСТАНОВЛЕНИЕ
о признании потерпевшим

г. Нижний Новгород                                    « 22 »   апреля   2016 г.
(место составления)

        Следователь по особо важным делам второго отдела по расследованию
особо важных дел следственного управления Следственного комитета Российской
Федерации  по  Нижегородской  области  старший  лейтенант  юстиции
Парамонов Е.В., рассмотрев материалы уголовного дела № 82493 ,

                        УСТАНОВИЛ:

        Настоящее  уголовное  дело  возбуждено  22.04.2016  по  признакам

преступления, предусмотренного ч. 4 ст. 159 УК РФ, по факту мошеннических действий неустановленных лиц, совершенных в отношении Тихонова Д.Н.

В ходе предварительного следствия установлено, что в один из дней мая 2009 года неустановленные лица из корыстных побуждений с целью приобретения права на имущество – ¼ доли квартиры, расположенной по адресу: г. Нижний Новгород, ул. Витебская, д. 6, кв. 8, путем обмана, изготовили договор займа с залоговым обеспечением и договор залога имущества, куда внесли не соответствующие действительности сведения о получении Тихоновым Д.Н. денежного займа в сумме 224 000 рублей, при этом заведомо зная о текущую неспособность последнего возвратить в полном объеме сумму займа, после чего 15.06.2009 склонили Тихонова Д.Н. к подписанию указанные договоры.

В связи с несостоятельностью выплаты займа в сумме 224 000 рублей, заведомо ложно указанной в договорах, право собственности на ¼ доли квартиры, расположенной по адресу: г. Нижний Новгород, ул. Витебская, д. 6, кв. 8, утрачено Тихоновым Д.Н. после регистрации перехода права собственности на основании постановления судебного пристава-исполнителя о передаче нереализованного имущества должника взыскателю 08.07.2013 и акта передачи нереализованного имущества должника взыскателю в счет погашения долга.

Полученной долей жилого помещения среднерыночной стоимостью 1 000 000 рублей, право на которое незаконно приобретено путем обмана, неустановленные лица распорядились по своему усмотрению.

На основании изложенного, и учитывая, что ___Тихонову Д.Н.____
<span>(фамилия, имя, отчество лица, признаваемого потерпевшим)</span>

причинен    имущественный вред _____

руководствуясь ст. 42 УПК РФ,

ПОСТАНОВИЛ:

Признать потерпевшим    ___Тихонова Дмитрия Николаевича, 26.10.1989 г.р.___

по уголовному делу №    ___824931___, о чем объявить

ему под расписку.

Следователь _____

<span>(подпись.)</span>





Сообщаю, что Ваше обращение по уголовному делу № 823428 прокуратурой области рассмотрено.

Установлено, что 17.04.2016 следователем СО по г. Дзержинск СУ СК России по Нижегородской области возбуждено уголовное дело № 823428 по признакам преступления, предусмотренного ч. 3 ст. 291 УК РФ, по факту вмешательства в деятельность Дзержинского городского суда.

В настоящее время уголовное дело находится в производстве второго отдела по расследованию особо важных дел СУ СК России по Нижегородской области, срок следствия продлен до 17.07.2016.

О результатах расследования заинтересованные лица будут уведомлены в установленном уголовно-процессуальным законодательством порядке.

Начальник 3 отдела управления по
надзору за уголовно-процессуальной
и оперативно-розыскной деятельностью
прокуратуры области                                                    Д.В. Чиннов



Б   555778





Генеральная прокуратура
Российской Федерации

Директору ОАО
«Санаторий Автомобилист»

Дурандину В.Н.

пер. Охотский, д. 6,
г. Нижний Новгород, 603022

07.2016    15/2-2958-11

На №

В Генеральной прокуратуре Российской Федерации рассмотрено Ваше обращение о несогласии с постановлением об отказе в возбуждении уголовного дела, вынесенным 01.04.2014 СО по г. Дзержинску СУ СК России по Нижегородской области, и по другим вопросам.

Разъясняю, что указанное постановление 05.04.2016 отменено заместителем прокурора Нижегородской области, и по результатам дополнительной проверки названным следственным органом 11.04.2016 возбуждено уголовное дело о вмешательстве в деятельность суда. Расследование по уголовному делу контролируется.

Для разрешения доводов о передаче в производство одного следственного органа уголовных дел о неправомерных действиях адвоката Рыжова Е.В., расследуемых СУ СК России по Нижегородской области и СУ по ЮАО ГСУ СК России по г. Москве, копия настоящего обращения направлена по подведомственности в Следственный комитет Российской Федерации.

Также сообщаю, что заместителем Генерального прокурора Российской Федерации Малиновским В.В. в адрес Председателя СК России направлено повторное письмо о передаче упомянутых в Вашем обращении уголовных дел в производство одного следственного органа.

Представленные копии документов возвращаются.

Приложение: на 25 л.

Старший прокурор отдела управления
по надзору за процессуальной деятельностью
Следственного комитета
Российской Федерации                                    А.М. Тимербулатов

10/11

Ryzhov's microfinance organization was staking on boys and pensioners. Those who are easier to influence. Fraudster Evgeny Ryzhov is now in Miami and, apparently, is not poor. His business lives on. People still cannot get rid of their annoying neighbors. Isn't it time for the country's Attorney General's Office to turn its attention to this outrageous story?

# Exhibit B

2/3/23, 2:43 PM                                                                 Contacts



☆ rotgar.ru

**SEO продвижение Google. Опыт 10 лет!**

Быстро и качественно • Белые методы • Гарантии в договоре

Узнать больше

⊞ AUTHORIZATION                    MOSCOW ▾        VK  ✈  Я  ⊕  18+

# FIRST RUSSIAN                    TSARGRAD        DISABLE ADS

≡ CATEGORIES | NEWS | ARTICLES | BOOKS |   |  OUR HEROES | ETHER | INVESTIGATIONS | 🔍

## CONTACTS

- 115093, MOSCOW, PARTYNY LANE,
  1, OFFICE 57, BUILDING 3, FLOOR 1, ROOM I, ROOM 45

- +7 (495) 374-77-73

## CONTACT US

| FULL NAME |
| TELEPHONE |
| E-MAIL |

MESSAGE

SEND A MESSAGE

∧ up



ПЕРВЫЙ РУССКИЙ

115093, Moscow, Partyny lane, 1, room 57,
building 3, floor 1, room I, room 45
Tel.: +7 (495) 374-77-73
info@tsargrad.tv
Press-release: pressexpress@tsargrad.tv

The media outlet Tsargrad (Tsargrad) is registered by the Federal Service for Supervision of Communications, Information Technology and Mass Media. Registration number and date of the decision to register the media: series ЭЛ No. ФС77-61259 dated June 30, 2021.

Editor-in-Chief: O. Tsikareva D.I.
Founder - NJSC "Tsargrad media"
Address of the editorial office - 115093, Moscow, party lane, 1, room 57, building 3, floor 1, room I, room 45

Copying and use of full materials is prohibited, partial quoting is possible only with a hyperlink to the site tsargrad.tv. The hyperlink must be placed directly in the text that reproduces the original tsargrad.tv material. The editors are not responsible for the information and opinions expressed in the comments of readers and news materials compiled on the basis of messages from readers.

© 2023, all rights reserved. NJSC Tsargrad Media.

Personal data processing policy

VK  ✈  Я  ⊕      CONTACTS      ADVERTISERS      ABOUT TV CHANNEL

# Exhibit C

tsargrad.tv /articles/teploe-mesto-ssha-vstretili-aferista-ryzhova-tjurmoj_163102

# Теплое место: США встретили афериста Рыжова тюрьмой

Егор Кучер ⦂ 10/11/2018



Сбежавший в США от уголовного преследования за аферы с недвижимостью нижегородский адвокат Евгений Рыжов выступил на форуме «политических беженцев». Он пожаловался на свою трудную судьбу, заключение в американской тюрьме, преследование со стороны российских властей и Интерпола

Царьград ранее уже рассказывал о масштабных махинациях Евгения Рыжова, которые дают полное право считать этого юриста одним из самых успешных аферистов России последнего времени. В распоряжении телеканала оказались материалы уголовного дела, возбужденного в отношении беглого адвоката. Несмотря на открытие производства следственными органами, Рыжов сумел благополучно избежать ответственности и скрыться в США.

Там адвокат планирует неплохо устроиться со своим капиталом. А пока этого не произошло, он активно выступает в СМИ, принимает участие во всевозможных форумах и встречах, где рассказывает о своей нелегкой судьбе и якобы необоснованном преследовании российскими властями.

Парадокс ситуации в том, что «нормальные» криминальные элементы предпочитают залечь на дно и не мутить воду. Рыжов же, напротив, старается наделать побольше шума. Психологи знают, что многократное повторение некоего ложного суждения постепенно создает иллюзию его истинности. Вероятно, такова и логика Рыжова, так как, кроме как на риторику, ему уповать особенно не на что.

9 октября (в ночь на 10 октября по московскому времени) в Майами Евгений Рыжов выступил на встрече «Бизнес-беженцы из России — проблемы и решения», которую организовало посвященное современной иммиграции в США издание Rubic. На этой встрече успешный бизнесмен и адвокат примерил на себя маску безвинно осужденного героя, которого при миллионных хищениях почему-то преследуют в России «по политическим мотивам».

**«Власти США проявляют заботу»**

Модератором дискуссии выступила Екатерина Панова — главный редактор и основатель портала Rubic. Во вступительном слове она иронично заявила, что рада познакомить собравшихся с представителями «отборного криминала, по мнению Кремля и российской пропаганды». Модератор подчеркнула, что сама она — украинка, никогда в России не проживала и именно на этом основании претендует на объективность.

Когда микрофон был передан Рыжову, он поведал собравшимся свою историю. В речи юриста, конечно же, не нашлось места его микрофинансовой организации, через поддельные договоры с которой он «отжимал» квартиры у нижегородцев и выставлял их на улицу, также не было сказано о попытке захвата санатория «Автомобилист» и других аналогичных случаях.



Фото: www.globallookpress.com

Зато Рыжов рассказал о конфликте, произошедшем у него с экс-главой ГСУ СК по Москве Александром Дрымановым, который уже арестован в России по обвинению в коррупции. При этом Рыжов отметил, что сам ни в чем не виноват, просто кто-то очень хочет отобрать недвижимость у его бывших клиентов.

По версии Рыжова, Дрыманов якобы отдал приказ о его похищении. Адвокат сумел сбежать из места своего заточения по пожарной лестнице, затем попал в Европу, а оттуда — в США. Там его, правда, ждал не очень теплый прием: он был арестован и попал в тюрьму.

«На фоне российской тюрьмы американская — это пионерский лагерь строгого режима. Жить там можно, хотя присутствуют забавные персонажи — темные ребята, которые занимаются спортом с утра до вечера и прекрасно играют в футбол, не хуже российской сборной, не в обиду будет сказано», — отметил Рыжов.

> Американскому правосудию хватило 22 дней, чтобы разобраться в моем деле. На тот момент я уже не был в Интерполе (в списках разыскиваемых — ред.) и не совершал тут никаких правонарушений. Американская судья очень удивилась, что меня 22 дня в тюрьме продержали. Но никто, включая прокурора, не смог объяснить причину задержания,

— поведал беглый аферист.

Рыжов при этом заявил, что очень хотел бы вернуться в Россию, чтобы «разобраться в правовом поле» с Дрымановым и делами клиентов. Это заявление выглядит совсем уж смешно, потому что адвокату никто не мешает это сделать: надо просто вернуться и предстать перед судом, где всегда есть возможность доказать свою невиновность. Однако Рыжов, как мы видим, лишь продолжает разговоры об этом из-за океана. При этом власти США хоть и отпустили беглеца из тюрьмы, не торопятся давать ему статус беженца, хотя Рыжов уверен, что о нем «проявляют заботу» и «с интересом следят» за его делом.

«Претензии властей США сводятся к тому, что я остался тут после истечения туристической визы, но они дали мне бумагу с требованием не покидать территорию США. То есть в одной руке истекшая виза, в другой — просьба властей США: "Ты, главное, из страны не уезжай, мы обязательно о тебе позаботимся"», — сказал Рыжов.

Совершенно очевидно, что Рыжов был задержан в США по запросу Интерпола, потому что ранее был объявлен в международный розыск. Затем американцы в свойственной им манере решили отпустить беглеца. Ведь преступления он совершал в России, а это американские суды не волнует.

Утверждение насчет «заботы» также выглядит крайне смешным: во всем мире документы, запрещающие покидать страну, называются подпиской о невыезде. Именно такой документ получил на руки Рыжов и был отпущен из тюрьмы под эту подписку. Это значит, что в США ему уже не так комфортно сейчас и будет еще менее комфортно в будущем.

Остается только удивляться тому, как складно в словах Рыжова все оказалось вывернуто наизнанку. Он пострадал от рук преступного генерала Дрыманова, пережил похищение и тюрьму в США. Ну чем не образ страдальца?



Фото: www.globallookpress.com

Однако для лучшего понимания расскажем о том, что же наделал в России аферист Рыжов. Об этом ярко свидетельствуют материалы уголовного дела.

**Алчность без границ**

Большинство схем, которые использовали Рыжов и его подельники, очень похожи друг на друга. Как сказано в справке по эпизодам дела Рыжова (есть в распоряжении Царьграда), от рук адвоката пострадали 27 собственников квартир. Первым звеном цепи был заем, который Рыжов предоставлял собственнику через свою микрофинансовую организацию. Заем этот предоставлялся под залог доли в квартире, причем сумма была не слишком значительной — от 100 до 250 тыс. рублей.

Затем Рыжов подделывал договор, меняя в нем сумму и сроки погашения, и через своих представителей подавал иск в суд на заемщика. Суд он, как правило, выигрывал, и собственность на долю в квартире переходила к Рыжову через подставных лиц. После этого адвокат применял уже широко известную схему по захвату всей квартиры через одну долю — на официальных основаниях и с решением суда на руках новый собственник из числа нанятых Рыжовым людей совершенно законно подселялся в квартиру. Он мог менять замки в дверях или просто делать жизнь проживающих в квартире людей невыносимой, склоняя их к продаже или передаче долей.

Как рассказал в эксклюзивном интервью Царьграду партнер юридического бюро «TM-Defence» Олег Жуков, Рыжов не смог бы столь эффективно проворачивать этот механизм снова и снова, если бы не помощь других лиц.

> Там был один и тот же суд, где судьей был некто Великанов, который теперь является заместителем главы суда Владимирской области. Адвокаты, которые знакомились с материалами дела в отношении подельников Рыжова — Лысаковского и Чернова, — видели, что там была дружественная переписка между судьей Великановым и Черновым. И все суды были в Дзержинском районе, где судьей был Великанов,

— рассказал Жуков.

По его словам, по одному из дел Рыжов предоставил оригинал договора займа, и когда была назначена почерковедческая экспертиза, то Рыжов под предлогом ознакомления с материалами дела попросту пришел и похитил оригиналы документов. Жуков отметил, что этим действиям Рыжова также была дана оценка следствием.

Одной из пострадавших собственниц квартир была жительница Нижнего Новгорода Светлана Тихонова. Она рассказала Царьграду, что ее сын еще в 2009 году взял в компании Рыжова заем на 100 тыс. рублей и по ошибке или незнанию подписал договор о залоге своей доли в квартире. Причем остальные члены семьи об этом не знали до тех пор, пока в квартиру в 2013 году не вломился сам Рыжов вместе с Лысаковским и другими подельниками.

Они заявили, что на основании решения суда владеют 1/4 долей в квартире и намерены получить ее целиком. Хозяева попытались не пустить незваных гостей, однако те вошли силой и стали угрожать Тихоновой и ее семье. Примечательно, что этот эпизод был снят на видео самим Рыжовым, эти записи сейчас также фигурируют в материалах уголовного дела в отношении беглого адвоката.

Сама Тихонова рассказала, что вынуждена была заплатить по решению суда требуемую сумму в 500 тыс. рублей, чтобы освободиться от преследования со стороны банды Рыжова. На положительное решение по делу надежды уже не осталось, так как Рыжов находится в США, а без его очного участия в деле решение не может быть принято, добавила она.



Фото: www.globallookpress.com

«Следственный комитет говорит, что это нереально, заочно такие вопросы не решаются. Для этого его надо депортировать в Россию, чтобы здесь состоялся очный суд, и только тогда будет решение о возврате каких-то денег», — сказала Тихонова.

«Мы выплатили те деньги, которые суд нам присудил ни за что, за нашу же квартиру. Для нас это огромная сумма, ее собирали со всех родственников, заплатили и освободились таким образом и от долга, и от Рыжова», — рассказала пострадавшая собственница.

Однако Рыжов и его сообщники не ограничились рейдерскими захватами квартир. Еще одним пострадавшим стал Валерий Дурандин — бывший собственник нижегородского санатория «Автомобилист». Дурандин осуществлял финансирование санатория через компанию «Сирин», которая и стала объектом рейдерского захвата со стороны банды Рыжова.

Дурандин рассказал Царьграду, что в январе 2010 года Рыжов пришел к нему и заявил, что купил пятидесятипроцентную долю в «Сирине», и предложил разделить компанию. Однако Дурандин отказал ему в этом, на что в ответ услышал от Рыжова угрозы «найти другие методы воздействия».

В марте 2010 года Дзержинский городской суд зарегистрировал исковое заявление о взыскании долга с Дурандина якобы по договору займа под 9% в месяц от 2009 года. Заимодавцем выступал некий Бачу, уроженец Сочи, что также подтверждается в справке по эпизодам дела Рыжова. В феврале 2011 года суд присудил взыскать с Дурандина 34,2 млн рублей долга в пользу Бачу.

«После этого Рыжов быстренько также через суд переоформил право требования долга на себя. Якобы он заплатил за меня всю сумму этому Бачу. Который, кстати, оспаривал это, но проиграл суд Рыжову, так как на тот момент в судах у его были крепкие связи. Это подтверждается протоколом допроса подельника Рыжова, некоего Пирумова», — рассказал Дурандин.

Затем Рыжов своими 50% в «Сирине» сместил с должности главы компании брата Дурандина и со своими подельниками продал все активы «Сирина» сначала одному гражданину Узбекистана, затем другому, а тот передал безвозмездно их офшорной компании «Пауэр Кроун ЛТД». После изъятия следствием содержимого банковской ячейки Рыжова было установлено, то именно он является владельцем этой компании.

По словам Дурандина, чтобы окончательно выдавить из санатория «Автомобилист» его законных владельцев и персонал, банда Рыжова прибегла к помощи судебных приставов, которые приезжали «помогать захватывать» имущество с группой из 15 спецназовцев.



Фото: www.globallookpress.com

Персонал капитулировал, так как «власть есть власть», заявил Дурандин. Вместе с тем угрозы сыпались и в адрес него самого и его семьи.

«Методы давления у них были на меня и мою семью совершенно как в лихие 90-е. 23 февраля 2011 года они подвесили на калитку моего дома гранату с растяжкой, которая, как выяснилось впоследствии, была учебной. Нервы пощекотали. Затем они присылали СМС-сообщения с

незнакомых номеров, мол, отдай подобру-поздорову, и мы отстанем, у тебя и дети есть, и внуки, так что имей в виду», — рассказал Царьграду Дурандин.

Партнер юридического бюро «TM-Defence» Олег Жуков рассказал Царьграду, что апофеозом алчности Рыжова стала попытка рейдерского захвата здания в самом центре Москвы, на Гоголевском бульваре. Попытка эта в итоге провалилась, к тому же в отношении Рыжова тогда появилось много жалоб. За адвокатом также сформировался целый шлейф дел по мотивам захвата квартир в Нижнем Новгороде. В итоге все дела были объединены в одно производство (по словам Дурандина, дело санатория «Автомобилист» все же существует отдельно), а сам Рыжов не стал дожидаться, пока его арестуют, и сбежал в США.

\* \* \*

Удивительна все-таки способность беглецов вроде Рыжова выставлять себя в качестве жертв! И в США охотно верят в тренд о политических заключенных, которых сажают в тюрьмы по «наветам Кремля», а также преследуют за границей.

Остается верить, что в США действительно разберутся с делом Рыжова, и он вернется в «пионерский лагерь строгого режима», а еще лучше — будет экстрадирован в Россию, где понесет соответствующее наказание. Этим бы правовая система США показала Интерполу и вообще всему миру, что она все-таки справляется со своей работой, а не прикрывает отпетых преступников.

В России же по статье о мошенничестве Рыжову может грозить заключение сроком до 10 лет. Однако не исключено, что следствие все-таки усмотрит в его действиях признаки организации преступного сообщества. За это статья 210 Уголовного кодекса предусматривает еще более жесткое наказание, вполне адекватное проявленным Рыжовым алчности и безразличию к судьбам обманутых им людей. По этой статье один из крупнейших аферистов последнего десятилетия в России может угодить за решетку и пожизненно.



**DeepL**

Subscribe to DeepL Pro to translate larger documents.
Visit www.DeepL.com/pro for more information.

tsargrad.tv /articles/teploe-mesto-ssha-vstretili-aferista-ryzhova-tjurmoj_163102

# A warm place: the U.S. greeted the swindler Ryzhov with prison

Yegor Kucher : : 10/11/2018



Yevgeny Ryzhov, a lawyer from Nizhny Novgorod, who escaped to the United States from criminal prosecution for real estate fraud, spoke at a forum of "political refugees. He complained about his difficult fate, his imprisonment in an American prison, persecution by Russian authorities and Interpol

Tsargrad previously reported on the large-scale machinations of Yevgeny Ryzhov, which gave him the right to be considered one of the most successful swindlers in Russia in recent times. The TV channel has in its possession materials of the criminal case initiated against the fugitive lawyer. Despite the opening of the proceedings by the investigative authorities, Ryzhov managed to avoid responsibility and escaped to the United States.

There, the lawyer plans to make a good living with his capital. Until this happens, he is active in the media, taking part in all kinds of forums and meetings, where he talks about his difficult fate and allegedly unfounded persecution by the Russian authorities.

The paradox of the situation is that "normal" criminal elements prefer to lie low and not stir the waters. Ryzhov, on the contrary, tries to make more noise. Psychologists know that repeatedly repeating a false judgment gradually creates the illusion that it is true.
This is probably Ryzhov's logic, since he has nothing but rhetoric to fall back on.

On October 9 (the night of October 10, Moscow time) in Miami, Evgeny Ryzhov spoke at a meeting called "Business Refugees from Russia - Problems and Solutions" organized by Rubic, a publication devoted to contemporary immigration to the United States. At the meeting, the successful businessman and lawyer tried on the mask of an innocent convicted hero who, for some reason, is persecuted in Russia for "political reasons" when he embezzles millions.

**"U.S. authorities show concern."**

The discussion was moderated by Ekaterina Panova, editor-in-chief and founder of the Rubic portal. In her opening remarks, she ironically stated that she was happy to introduce the audience to "selected criminals, according to the Kremlin and Russian propaganda. The moderator stressed that she herself was Ukrainian, had never lived in Russia, and on this very basis claimed to be objective.

When the microphone was handed to Ryzhov, he told the audience his story. In the lawyer's speech, of course, there was no mention of his microfinance organization, through fake contracts with which he "snatched" apartments from Nizhny Novgorod residents and put them on the street, nor was there any mention of the attempted seizure of the Automobilist sanatorium and other similar cases.



Photo: www.globallookpress.com

But Ryzhov talked about the conflict he had with the former head of the State Investigative Committee for Moscow, Alexander Drymanov, who has already been arrested in Russia on charges of corruption. At the same time, Ryzhov noted that he himself was not guilty of anything, just that someone very much wants to take real estate from his former clients.

According to Ryzhov's version, Drymanov allegedly gave the order to kidnap him. The lawyer managed to escape from his confinement by a fire escape, then made his way to Europe, and from there - to the United States. There, however, he did not receive a very warm welcome: he was arrested and imprisoned.

"Against the backdrop of the Russian prison, the American prison is a high-security pioneer camp. It is possible to live there, although there are amusing characters - dark guys who play sports from morning till night and play excellent soccer, not worse than the Russian national team, no offense meant,
— Ryzhov noted.

> It took American justice 22 days to sort out my case. At that time I was no longer on the Interpol list and I hadn't committed any offenses here. The American judge was very surprised that I was in jail for 22 days. But no one, including the prosecutor, could explain the reason for my detention,

— The fugitive swindler told the story.

Ryzhov also said that he would love to go back to Russia in order to "work things out in the legal field" with Drymanov and the cases of his clients. This statement looks quite ridiculous, because no one prevents the lawyer from doing that: he just has to return and appear in court, where there is always a chance to prove his innocence. However, Ryzhov, as we can see, only continues the talk about it from across the ocean. Although the U.S. authorities released the fugitive from prison, they are in no hurry to give him refugee status, although Ryzhov is sure that they "care" about him and are "following his case with interest.

"The claim of the U.S. authorities is that I stayed here after my tourist visa expired, but they gave me a paper with the requirement not to leave the territory of the United States. That is, in one hand the expired visa and in the other - a request from the U.S. authorities: "The main thing is that you do not leave the country, we will definitely take care of you," said Ryzhov.

It is obvious that Ryzhov was detained in the U.S. at the request of Interpol, because he was previously on the international wanted list. Then the Americans, in their usual manner, decided to release the fugitive. After all, he committed crimes in Russia, and American courts do not care about that.

The statement about "care" also looks extremely ridiculous: all over the world, the documents forbidding one to leave the country are called a written undertaking not to leave the country. This is exactly the document Ryzhov received and was released from prison on his own recognizance. This means that he is not so comfortable in the U.S. now and will be even less comfortable in the future.

We can only wonder how neatly Ryzhov's words turned everything inside out. He suffered at the hands of the criminal general Drymanov, and survived kidnapping and imprisonment in the United States. Isn't this the image of a sufferer?



Photo: www.globallookpress.com

However, for a better understanding, let's talk about what the swindler Ryzhov did in Russia. The materials of the criminal case vividly testify to this.

**Greed without Borders**

Most of the schemes used by Ryzhov and his accomplices are very similar to each other. According to a summary of Ryzhov's case episodes (available to Tsargrad), 27 apartment owners suffered at the hands of the lawyer. The first link in the chain was a loan, which Ryzhov provided to owners through his microfinance organization. This loan was granted against the security of a share in the apartment, and the amount was not too significant - from 100 to 250 thousand rubles.

Then Ryzhov would forge a contract, changing the amount and terms of repayment in it, and through his representatives he would sue the borrower. As a rule, he won the court case, and the ownership of the apartment was transferred to Ryzhov through fictitious persons. After that the lawyer used a widely known scheme of taking the whole apartment through one share: on official bases and with the court decision a new owner out of people hired by Ryzhov legitimately moved into the apartment. He could change the locks on the doors or simply make the life of the people living in the apartment unbearable by inducing them to sell or transfer their shares.

Oleg Zhukov, a partner at the TM-Defence law firm, told Tsargrad in an exclusive interview with Tsargrad that Ryzhov would not have been able to pull off this mechanism so effectively over and over again if not for the help of others.

> There was the same court, where the judge was a certain Velikanov, who is now the deputy head of the court of the Vladimir region. Lawyers who were familiarizing themselves with the materials of the case against Rizhov's accomplices, Lysakovsky and Chernov, saw that there was friendly correspondence between Judge Velikanov and Chernov. And all the trials were in the Dzerzhinsky district, where Velikanov was the judge,

— said Zhukov.

According to him, in one of the cases Ryzhov provided the original loan agreement, and when a handwriting expertise was appointed, Ryzhov simply came and stole the original documents under the pretext of familiarizing himself with the case materials. Zhukov noted that these actions of Ryzhov were also evaluated by the investigation.

Svetlana Tikhonova, a resident of Nizhny Novgorod, was one of the victims. She told Tsargrad that her son took a loan of 100,000 rubles from Ryzhov's company back in 2009 and mistakenly or unknowingly signed a pledge agreement for his share of the apartment. The rest of the family did not know about it until Ryzhov himself, along with Lysakovsky and other accomplices, broke into the apartment in 2013.

They stated that on the basis of a court decision they owned a 1/4 share in the apartment and intended to get it in its entirety. The owners tried not to let the uninvited guests in, but they entered by force and threatened Tikhonova and her family. It is noteworthy that this episode was filmed on video by Ryzhov himself, these recordings are also included in the materials of the criminal case against the fugitive lawyer.

Tikhonova herself said that she was forced to pay the required sum of 500 thousand rubles by court order in order to be free from prosecution by Ryzhov's gang. There was no hope for a positive decision in the case, because Ryzhov was in the United States, and no decision could be made without his personal participation in the case, she added.



Photo: www.globallookpress.com

"The Investigative Committee says that this is unrealistic, such issues are not solved in absentia. To do this, he has to be deported to Russia, so that there will be a trial in person, and only then there will be a decision to return some money," said Tikhonova.

"We paid the money that the court awarded us for nothing, for our own apartment. It was a huge amount for us, it was collected from all our relatives, we paid it and thus we were free from the debt and from Ryzhov", - said the affected owner.

However, Ryzhov and his accomplices did not limit themselves to raiding apartments. Another victim was Valery Durandin, the former owner of the Nizhny Novgorod sanatorium
"Avtomobilist". Durandin financed the sanatorium through the company "Sirin", which became the object of a raider seizure by Ryzhov's gang.

Durandin told Tsargrad that in January 2010 Ryzhov came to him and said
bought a fifty-percent stake in Sirin, and offered to split up the company. However, Durandin refused him, to which he heard Ryzhov threaten to "find other methods of influence" in response.

In March 2010, the Dzerzhinsk City Court registered a lawsuit to recover a debt from Durandin, allegedly under a loan agreement at 9% per month from 2009. The lender was a certain Bachu, a native of Sochi, which is also confirmed in the certificate of the Ryzhov case episodes. In February 2011, the court ordered to recover from Durandin 34.2 million rubles of the debt in favor of Bachu.

"After that Ryzhov quickly reassigned the right to claim the debt to himself, also through the court. Allegedly he paid the entire amount for me to this Bach. The latter, by the way, disputed this, but lost the trial to Ryzhov, because at that time he had strong connections in the courts. This is confirmed by the interrogation report of Ryzhov's accomplice, one Pirumov", said Durandin.

Then Ryzhov, with his 50% in Sirin, ousted his brother Durandin from his position as head of the company and sold all the assets of Sirin together with his accomplices, first to one citizen of Uzbekistan, then to another, who gave them free of charge to an offshore company, Power Crown Ltd. After the investigation confiscated the contents of Ryzhov's safe deposit box, it was established that he was the owner of this company.

According to Durandin, in order to squeeze the legal owners and staff out of the sanatorium, Ryzhov's gang resorted to the help of bailiffs, who came to
"help seize" property with a group of 15 special forces.



Photo: www.globallookpress.com

The staff capitulated, because "power is power," Durandin said. At the same time, threats were also made against him and his family.

"Their methods of pressure on me and my family were just like in the wild 90s. On February 23, 2011 they hung a grenade with a trip wire on the gate of my house, which later turned out to be a training grenade. It tickled the nerves. Then they sent text messages with

You have children and grandchildren, so keep that in mind," Durandin told Tsargrad.

Oleg Zhukov, a partner at TM-Defence, told Tsargrad that the apotheosis of Ryzhov's greed was an attempt to raid a building in the center of Moscow, on Gogolevsky Boulevard. This attempt failed in the end, and there were many complaints against Ryzhov. The lawyer also generated a whole train of cases on the grounds of the seizure of apartments in Nizhny Novgorod. As a result, all the cases were merged into one proceeding (according to Durandin, the Automobilist sanatorium case still exists separately), and Ryzhov himself did not wait until he was arrested and fled to the United States.

* * *

The ability of fugitives like Ryzhov to portray themselves as victims is amazing! And in the U.S., they willingly believe in the trend of political prisoners who are imprisoned because of "Kremlin slander," as well as persecuted abroad.

We can only hope that the U.S. will really look into the Ryzhov case, and he will return to the "pioneer high-security camp", or better yet - be extradited to Russia, where he will be punished accordingly. This would show the U.S. legal system to Interpol and the world at large that it is doing its job, rather than covering up for hardened criminals.

In Russia, Ryzhov could face up to 10 years in prison under the article on fraud. However, it is possible that the investigation will still find signs of organization of a criminal association in his actions. For this article 210 of the Criminal Code provides even harsher punishment, which is adequate to the greed and indifference to the fate of people deceived by Ryzhov. Under this article, one of the biggest swindlers of the last decade in Russia can go to jail for life.

# IN UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**United States Courthouse New York, New York**

Manhattan, New York
500 Pearl Street, New York, NY 10007
(212) 805-0136

## Dear Clerks of the Court

Please find enclosed the following documents:

1. Civil Cover Sheet;
2. Cheque for $402;
3. Plaintiff's Complaint accompanied by Plaintiff's Declaration with exhibits;
4. Summons for Defendants.

Dated February 04, 2023                    Respectfully submitted

By

Evgeny RYZHOV

E.Ryzhov@yahoo.com



PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

**PRIORITY** ★ MAIL ★

*UNITED STATES POSTAL SERVICE®*
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:

Evgeny RYZHOV
250 174th Str. apt. 1918
Sunny Isles Beach
FL 33160

TO:

United States Courthouse, New York
New York
Manhattan, New York
500 Pearl Street, New York
NY 10007

Label 228, March 2016          FOR DOMESTIC AND INTERNATIONAL USE

RECEIVED
FEB 6 2023
CLERKS OFFICE
S.D.N.Y

**POS...**

- Expected delivery
- Most domestic sh...
- USPS Tracking® in...
- Limited internation...
- When used interna...

*Insurance does not cove...
Domestic Mail Manual at...

** See International Mail M...

**FLAT RAT...**
ONE RATE ■ ANY...

**TRACKED**

PS000010000...

*UNITED STATES POSTAL SERVICE.*          Retail

P   US POSTAGE PAID
**$9.65**
Origin: 98...
02/04/23
542776028...-8

PRIORITY MAIL®

0 Lb 14.30 Oz

RDC 04

EXPECTED DELIVERY DAY:   02/07/23

C099

SHIP
TO:   500 PEARL ST
NEW YORK NY 10007-1316

USPS TRACKING® #

9505 5142 0611 3035 9087 88