**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**1:23-cv-01072-JMF**

Evgeny RYZHOV

*Plaintiff*

-v-

**Jury Trial Demanded**

$5,379,876.94 In United States Currency Formerly
on Deposit in Sunflower Bank, NA et al

*Defendants*

_____/

**FIRST AMENDED COMPLAINT**

Plaintiff Evgeny Ryzhov ("Plaintiff" or "Ryzhov"), for his First Amended Complaint against $5,379,876.94 in US currency formerly on Deposit in Sunflower Bank NA Account 1101996560 held in the name of "OFAC" blocked account "Malofeyev" ("Account"), Konstantin Malofeyev ("Malofeyev"), Tsargrad TV ("Tsargrad" and all together "Defendants"), alleges as follows:

**NATURE OF THE CASE**

1.  This RICO action seeks to recover damages caused to Plaintiff by the acts of Defendants as part of a group of individuals and entities who many years ago associated in an association-in-fact enterprise (hereafter "RICO Enterprise") for the common purpose of engaging in racketeering activities to gain illicit proceeds for their own benefit. Over the years of RICO Enterprise's existence, their victims have been innocent individuals and entities who happened to own valuable assets or profitable businesses. Each time, wanting to divest such a victim of their assets, RICO Enterprise developed different schemes and adapted them to the circumstances in the course of carrying them out, recruiting new members, and expanding the scope and nature of its activities. Although the organization of RICO Enterprise changed over time, and its members may have held different roles at different times, RICO Enterprise has generally been structured to operate as a unit in order to accomplish the goals of its criminal activities.

2.  In the present case Defendants were involved in divesting Plaintiff of his assets, with their subsequent laundering through a network of shelf companies, funds, and foreign accounts worldwide, with the simultaneous destruction of Plaintiff's reputation by commencing a smear campaign to eliminate his ability to conduct his international law business and make income, while, allowing RICO Enterprise to avoid liability. In particular, since May 2012, Defendant Malofeyev, acting in conspiracy with other members of RICO Enterprise and using force and intimidation, has been misappropriating Plaintiff's profits coming from the rent of the premises located in the center of Moscow, and entrusted to Plaintiff by his clients for his services rendered, as well as Defendant Malofeyev has been involved in devesting of Plaintiff's assets. A portion of these illegal proceeds was laundered through a series of sham transactions between Malofeev's shell companies and eventually ended up in Sunflower Bank NA.

3.  Also, to achieve RICO Enterprise's overall goal of taking over Plaintiff's assets and to suppress any possible counteraction from his side, Defendant Malofeyev corrupted General Drymanov, who, in 2014, began persecuting Plaintiff through a politically motivated criminal case, due to which Plaintiff has been abducted and held hostage for ransom. When Plaintiff managed to save himself abroad, General Drymanov, acting in conspiracy with RICO Enterprise, also exploited the bogus criminal case by attempting to extort a $3,000,000 ransom and property from Plaintiff. And upon Plaintiff's refusal, RICO Enterprise undertook another attempt to abduct Plaintiff, accompanying its persecution with constant transmitting death threats and grievous bodily harm to Plaintiff.

4.  Additionally, with Malofeev's consent and commission, to conceal the racketeering activities of RICO Enterprise, influence law enforcement agencies and courts, and intimidate supporters of Plaintiff, a smear campaign was launched. During this campaign, defamatory, fraudulent publications and statements about Plaintiff have been continuously distributed through the media controlled by Malofeev and RICO Enterprise. The total number of such publications, including their repetition in other media, has reached

1,000,000, which ruined Ryzhov's reputation, tortured him, interfered with, depleted, and destroyed his interstate legal and investment business.

## THE PARTIES

### A. The Plaintiff

5.   EVGENY RYZHOV ("Ryzhov"), the plaintiff, is a resident of Miami-Dade County, FL, an individual over the age of 18, a human right activist and licensed attorney in Russia, and a certified foreign legal consultant in the US, engaged in interstate and foreign law and investment businesses. Since 2014, Plaintiff has been persecuted by Russian authorities for his human rights and advocacy activities, including his open stance on Russian violations of international laws, including the 2014 invasion of Ukraine. Plaintiff is not only persecuted by the State for his activities but is also persecuted by a group of highly corrupt Russian officials and those close to them "businessmen" and "businesses" such as Defendants here, conducting their criminal affairs around the world and seeking to defraud Plaintiff. Ryzhov's dwelling address is 250 174th Str. Apt.1918, Sunny Isles Beach, FL 33160, USA, E.Ryzhov@yahoo.com, +7(910) 7971688.

### B. The Defendants

6.   $5,379,876.94 in United States currency formerly on deposit in Sunflower Bank, N.A. Account 1101996560, held in the name of "OFAC Blocked Account Malofeyev" (the "Defendant-in-rem").

7.   KONSTANTIN MALOFEYEV ("Malofeyev"), the defendant, is a Russian national who was at all relevant times the owner and managing partner of Marshall Capital Partners, which was a Russian equity investment group. In accordance with the indictment brough by the US against Malofeyev to this Court, "on or about December 19, 2014, the United States Department of the Treasury"s Office of Foreign Assets Control ("OFAC") designated MALOFEYEV as a Specially Designated National ("SDN"). In so designating MALOFEYEV, OFAC explained that MALOFEYEV was one of the main sources of

3

financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic."

8.   TSARGRAD OOO ("Tsargrad"), Russia-based company is a cornerstone of Malofeyev's broad malign influence network[1]. Tsargrad spreads pro-Kremlin propaganda and disinformation that is amplified by the Government of the Russian Federation ("GoR"). Tsargrad served as an intermediary organization between pro-Russian European politicians and GoR officials, and recently pledged to donate more than $10 million to support Russia's unprovoked war against Ukraine. Tsargrad was designated pursuant to E.O. 14024 for being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, Malofeyev.

**RELEVANT NONPARTIES**

9.   The nonparties are natural and artificial persons listed in paragraphs 10 through 14 below who have been engaged in RICO Enterprise activity on a regular basis or employed by it to commit certain single crimes.

10.  Artem Kuranov ("Kuranov"), born in Russia on April 2, 1976, holds EU citizenship and has been Malofeyev's partner since the early 2000s. While working for MDM-Bank, they met in the department dealing with Mergers and acquisitions (M&A) transactions, which were often carried out through extortion, fraud, and other crimes. After gaining experience working for MDM-Bank, the partners continued on their own. Each was involved in dozens of "projects" to take over businesses illegally and defraud banks and investors of loans they had no intention to repay.

---

[1] Malofeyev's Malign Influence Ecosystem, in accordance with the U.S. Treasury Designates Facilitators of Russian Sanctions Evasion, https://home.treasury.gov/news/press-releases/jy0731

11. Yuri Trushin ("Trushin"), born in the USSR on July 30, 1954, has EU citizenship, Kuranov's father-in-law. From the early 2000s to 2010, he has been the Chairman-Mgmt Bd/Gen Dir, Rosselkhozbank OJSC, where the Russian Federation is a major shareholder. In this bank, Kuranov received a $300-500 mln loan for the construction of a sugar factory, which was never built, and the funds were never repaid to the bank. Kuranov explained his failure to repay the loan by the fact that some shelf companies carried out sham deals to supply the equipment to the sugar factory and refused to return the money. At the end of 2010, Trushin was uncovered to be involved in multi-million-dollar embezzlement from Rosselkhozbank, after which he escaped abroad and settled in Austria and France. Upon information and belief after moving abroad, Trushin mainly deals with laundering money and property stolen in Russia.

12. Lyudmila A. Shabalkina is Trushin's common-law wife and the former Deputy Chief Executive Officer and General Director of Uralsib Financial Corp[2] ("UFC"). In 2005, RICO Enterprise proceeded with a scheme of a takeover of a dairy products manufacturer, JSC Nutrinvestholding ("Nutritech"), in which Malofeyev initially promised it to get a loan from UFC through Shabalkina in exchange for a 10%-15% shares of the entity. Having become a shareholder, he established Marshall Capital Partners. Then Marshall Capital actively raised funds for business development, using all available instruments: from issuing bonds to selling assets into newly created funds. In April 2007, the company held an initial public offering ("IPO"); in the summer of the same year, it established cooperation with the major investment companies AXA Private Equity and Paul Capital Partners, for which two private equity funds were created: MarCap I and MarCap II. The new investors invested $420 million in them, and MarCap Capital sold some of its assets to MarCap I. In all, more than $1.1 billion was raised over three years.

---

[2] *Ambriz Tracing Corp. v. Uralsib Financial Corp.,* 11 Civ. 4420 (SAS) (S.D.N.Y. Nov. 21, 2011), where Ambriz brought an action alleging (1) that defendants participated in a criminal enterprise under the Racketeer Influenced and Corrupt Organizations ("RICO") laws, (2) that defendants engaged in securities fraud in violation of the Securities Exchange Act of 1934 ("SEA"), and (3) unjust enrichment.

During the 2008 financial crisis, Nutritech defaulted. And at the end of 2009, auditors discovered a shadow receivable of 2.6 billion RUR or about $111 mln of the Nutritech group. From 2006 to 2009, Nutritech also transferred to the offshore DRD Group 1.8 billion RUR or $77 mln, of which only 929 million rubles were returned through the offshore chain. This DRD Group was also used to pay "the unofficial part of salaries and bonuses" to Nutritech employees. At the suggestion of Malofeyev, several shelf companies carried out sham deals to increase Nutritech's revenue; as a result, the auditors discovered a loss of about $30 million. Notably, the auditors received documents for only 47% of the transactions, with the rest missing due to a "car accident" and a "warehouse fire."

13. Equesman Holing LTD ("Equesman"), a Cypriot company, belongs to the above individuals directly or through their alter egos. In December 2007, this company, through its employee with a revoked power of attorney of Aquamarine LTD ("Aquamarine"), a Plaintiff's client, entered into a contract to purchase Aquamarine's expensive premises in the center of Moscow. However, Equesman failed to fulfill its payment obligations even under this fake contract. In this regard, the court later entered a judgment declaring this contract null and void ab initio and ordered Equesman to return the premises to Aquamarine. However, RICO Enterprise decided not to comply with the court's judgment, and instead began persecuting Aquamarine's shareholders and their representatives, including Plaintiff.

14. Oleg Vladimirovich JOUKOV (also known as Oleg Zhukov) ("Zhukov) is an active member of RICO Enterprise and a covert agent of Russian law enforcement, specializing in industrial patent espionage around the world. Somewhere in the mid-2000s, he merged with RICO Enterprise and has constantly performed various tasks for it, abusing his powers and authority.

## JURISDICTION AND VENUE

15. Jurisdiction is proper in this District as this case involves violations of Federal Law and thus involves federal questions and violations against a foreign citizen.

16. This Court has jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

17. Jurisdiction over Defendants is proper in this Court on the grounds that they conduct business within the United States and have been recognized to be under this Court's jurisdiction in previous litigations.

18. Also jurisdiction over Defendants is proper on the grounds that they were all co- conspirators who committed acts in furtherance of a conspiracy which they knew included acts in the United States, such as using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of the company, transferring threats and defamation statements.

19. Pursuant to 28 U.S.C. § 1332(a), "[a] case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (internal quotation marks and citation omitted).

20. Additionally, Rule 4(k)(2), Federal Rules of Civil Procedure, provides federal courts with personal jurisdiction over a foreign defendant "in federal question cases and if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." *See Eskofot A/S vs. EI Du Pont De Nemours & Company*, 872 F. Supp. 81 - Dist. Court, SD New York 1995.

21. Defendants are subject to this Court's personal jurisdiction under N.Y. C.P.L.R. §302(a) which provides that:  "…a court may exercise personal jurisdiction over any non-domiciliary who, either "in person or through an agent": (i) "transacts any business within the state or contracts anywhere to supply goods or services in the state"; (ii) "commits a tortious act within the state"; (iii) "commits a tortious act without the state causing injury to person or property within the state ... if he [a] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or [b] expects or should reasonably expect the act to

have consequences in the state and derives substantial revenue from interstate or international commerce";
or (iv) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. §302(a)(1)-(4).

22. "[C]ourts have explained that section 302 is a `single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir.2010) (internal quotation marks omitted); see also *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc*., 923 F.Supp. 433, 436 (S.D.N.Y.1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York as long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").

23. Foreign defendants can be subject to personal jurisdiction where another party "engaged in purposeful activities in the state ... with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit." *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988); see also *Kreutter v. McFadden Oil Corp*., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

24. Venue is proper in this district for all Defendants pursuant to 28 U.S.C. §1391(c)(3), which authorizes an action against an alien in any district.  Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. §1391(b)(2) because substantial actions in furtherance of the conspiracy giving rise to Plaintiff's claims occurred in this District.

25. Jurisdiction and venue are thus proper.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

26. Since 2005, Plaintiff has rendered legal services to his clients, including Aquamarine and its shareholders, Mikhail Chernov and Luben Marinov, which were mainly engaged in sales of agricultural machinery in Europe, providing them with their major income. Through Aquamarine, they owned

expensive premises located in the center of Moscow, which were leased to various tenants, including companies conducting legitimate business but owned by RICO Enterprise. At that time, neither Aquamarine nor its shareholders were aware of the criminal business conducted by RICO Enterprise.

27. In December 2007, one of RICO Enterprise's employees, Alexey Fedorov, acting under a revoked power of attorney from Aquamarine and in secrecy from it, entered into a contract with Equesman for the purchase and sale of the premises ("Contract").

28. Somewhere in the middle of 2008, Mikhail Chernov learned that Aquamarine and Equesman had entered into the Contract, but payment agreed upon had not been made, although the price specified in the contract was well below the market. Chernov then met with Kuranov, the founder of RICO Enterprise and Malofeev's partner, and suggested that Aquamarine could authorize this contract if the amount stipulated in the contract were paid in the near future. In turn, Kuranov, on behalf of RICO Enterprise, asked Chernov to give Equesman a short-term loan of €1,000,000 to increase its cash flow, after which it could obtain loans from banks and repay the Chernov loan and the contract amount for the premises, with penalties for late performance. Chernov was aware of the family ties between Kuranov and Trushin, as well as their informal ties to other banks and foundations through Shabalkina and Malofeyev, so he agreed and provided the requested loan.

29. As for the loan, RICO Enterprise defaulted to repay the loan, and in 2009 or so, Chernov brought an action against Equesman; thereafter, a settlement was concluded but never performed by RICO Enterprise. As for the premises, RICO Enterprise also defaulted to pay the contract amount, and Aquamarine brought an action against Equesman; in 2011, the court ruled that the contract of 2007 was null and void and ordered Equesman to return the premises to Aquamarine; this judgment was upheld by higher courts, up to and including the Supreme Court of the Russian Federation and is still in force. In April 2012, based on this judgment, Russian State Register made relevant entries in the state register that Aquamarine was the sole owner of the premises.

30. In May 2012, RICO Enterprise initiated a bogus criminal case against Chernov on trumped-up charges, the essence of which was that Chernov had allegedly robbed a RICO Enterprise employee in September 2009. While under arrest, Chernov appointed plaintiff Ryzhov as trustee of the premises and asked him to represent Aquamarine and its shareholders in criminal and civil cases, as well as to manage the premises in exchange for all incoming rent, deducting the costs of maintaining the premises. Those rent payments were assumed to be income to Plaintiff for his services rendered, and if the case were successful, Plaintiff would be additionally paid with a contingency fee in the amount of $2,000,000.

31. Due to the legal services rendered by Plaintiff, it was proved that Chernov had an alibi and that he had spent a considerable part of September 2009 in Bulgaria, so he could not have committed any crime in Moscow.

32. Then RICO Enterprise deployed another artifice. While Chernov was in custody, RICO Enterprise arranged for the prosecution and conviction of its employee Fedorov, who eventually pleaded guilty and was fined about $3,000. During this criminal prosecution, Fedorov gave false testimony against Chernov. After Fedorov's conviction went into force, it became binding for the prosecution of Cernov; based on it, Chernov was sentenced to seven years in prison without the opportunity to be heard in Fedorov's case or challenge that sentence or the facts found therein.

33. By exploiting this situation, RICO Enterprise refused to vacate the Aquamarine premises and, through controlled media, falsely and repeatedly broadcasted that Chernov was prosecuted and that RICO Enterprise, through Equesman, was the owner of the premises. In reality, it had no rights to it. RICO Enterprise also prevented Plaintiff Ryzhov from entering the premises and collected rent on its own from other tenants, which it divided among members of RICO Enterprise, including Malofeyev. RICO Enterprise appointed Zhukov to monitor the premises and collect rent on its behalf.

34. After Plaintiff Ryzhov won several more cases against RICO Enterprise, it resorted to political-criminal persecution, for which Enterprise recruited General Drymanov[3], who was in stable ties with Malofeyev's staff and was responsible for persecuting dissenters in Ukrainian cases until February 2015. Then, in February 2015, General Drymanov was appointed as the Head of the Investigative Committee of the Russian Federation for Moscow.

35. Around the same time, RICO Enterprise teamed up with another association-in-fact, run by Durandin, which aimed to take over Ryzhov's assets in the Nizhny Novgorod region. In this Complaint, all members of these associations will continue to be referred to as RICO Enterprise.

36. On June 03, 2015, some corrupt police officers, acting in concert with RICO Enterprise, broke into Ryzhov's apartment, ransacked it, abducted Ryzhov, and took him hostage, after which they began extorting him to sign documents transferring his own and clients' property to RICO Enterprise's members[4]. However, Ryzhov managed to escape from the extortionists and flew abroad, so RICO Enterprise had to modify its scheme to achieve its overall goal.

37. One of these modifications was the launch of a smear campaign against Plaintiff, carried out through various media resources controlled by RICO Enterprise, including those owned by Konstantin

---

[3] One of the top officers of the Russian Investigation Committee, an official of much influence During his carrier, Drymanov initiated politically motivated criminal cases "on the genocide of the Russian-speaking population of Donbas," to justify Russian involvement in the conflict and incitement of hatred against Ukraine in 2014. He repeatedly made false reports about the use of prohibited weapons by the Ukrainian army. He illegally instituted criminal proceedings against a captured Ukrainian pilot Nadezhda Savchenko and the commanders of the Ukrainian volunteer battalions Donbas, Aydar, and Dnipro-1. *See* https://www.spisok-putina.org/en/personas/drymanov-3/

[4] When Ryzhov left Russia, he had the following property: 1) Right to property, including real and intangible property held in a revocable Power Crown trust; 2) Right to income derived from the Power Crown trust; 3) Proprietary interest in the judgment debt of $656,308, entered by the court against Durandin; 4) Proprietary interest in conducting business in Russia, including legal and investment business; 5) Right to real property owned by Ryzhov, including apartments, houses and commercial real estate and interest in the realty of his clients; 6) Right to income from the real estate listed in the preceding clause; 7) Proprietary interest arising from a liberty interest in the reputation, good name, and integrity of Plaintiff to practice law; 8) Rights to movable property, including ATV, snowmobile, firearms. The listed property was valued at a minimum of $5,000,000 at 2015 prices.

Malofeyev, such as Tsargrad and others. De facto RICO Enterprise deployed Russia's disinformation and propaganda ecosystem ("Ecosystem") against Plaintiff, as detailed below. At the initial stage of the Plaintiff's persecution, RICO Enterprise tried to stay in the shadows and spread fraudulent and defamatory statements through corrupt officials. However, a bit later, it appointed Zhukov as its "spin doctor." The total number of such humiliating publications reached one million, making challenging them financially and physically impossible.

38. For many years, Malofeyev, being a RICO Enterprise member, has been receiving illegal income derived from a pattern of racketeering activity of RICO Enterprise, laundering the income and using it to acquire legitimate companies worldwide. Part of this income consists of monies and assets stolen from Plaintiff, laundered through a chain of shell companies and bank accounts, and eventually ending up among the $5,379,876.94 deposited in Sunflower Bank, NA, and intended to acquire a legitimate U.S. company(s).

39. Plaintiff believes that he is entitled to a portion of this deposited sum because the monies stolen from him and the proceeds of the stolen assets are contained in this sum and that a portion of this sum should be due to Ryzhov as compensation for Defendants' racketeering activity.

**CLAIMS FOR RELIEF**

**COUNT I: CONVERSION OF PLAINTIFF'S PROFIT**
**(Against Malofeyev and $5,379,876.94 deposited in Sunflower Bank, NA)**

40. Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

41. On information and belief, beginning from May 2012, Defendant Malofeyev, through the use of force and threats made by his agents and accomplices in bad faith, has been involved in the commission of the acts of conversion of Plaintiff's rental profits, amounted to at least $25,000 per month and coming from the premises trusted to Plaintiff by his clients. Further, between May 2012 and February 2014 inclusive, a portion of Plaintiff's stolen profits were laundered and intermingled with other funds of Defendant Malofeyev through a number of transactions through the maze of the shell companies

controlled by Malofeyev, including a Seychelles shell company called Investment Market Group Limited ("IMGL" or the "Shell Company"), and eventually ended up in a bank account at Sunflower Bank. All Plaintiff's requests to return the profits were refused.

42. Defendant Malofeyev has engaged in the above-mentioned acts for his own financial benefit.

43. The Second Circuit succinctly set forth the standards applicable to a claim for conversion under New York law in *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir.2006):

> According to New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of Am. v. Hous. Auth.,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (internal quotation marks omitted). This includes a "denial or violation of the plaintiff's dominion, rights, or possession" over her property. *Sporn* [*v. MCA Records, Inc.*], 58 N.Y.2d [482] at 487, 462 N.Y.S.2d 413, 448 N.E.2d 1324 [ (1983) ]. It also requires that the defendant exclude the owner from exercising her rights over the goods. *New York v. Seventh Regiment Fund, Inc.,* 98 N.Y.2d 249, 259, 746 N.Y.S.2d 637, 774 N.E.2d 702 (2002).

*See also Cruz v. TD Bank, N.A.,* 855 F.Supp.2d 157, 174 (S.D.N.Y.2012) (Castel, D.J.); *Goodman v. Port Auth. of New York and New Jersey,* 850 F.Supp.2d 363, 376–77 (S.D.N.Y.2012) (Sweet, D.J.); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Sys., LLC,* 842 F.Supp.2d 502, 513–14 (S.D.N.Y.2012) (Swain, D.J.).

"'Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiffs [sic] rights.' " *Cruz v. TD Bank, N.A., supra,* 855 F.Supp.2d at 174, *quoting Colavito v. New York Organ Donor Network, Inc.,* 8 N.Y.3d 43, 49–50, 827 N.Y.S.2d 96, 100, 860 N.E.2d 713, 717 (2006). Additionally, "[a] plaintiff alleging conversion need not show fault by the defendant." *Cruz v. TD Bank, N.A., supra,* 2012 WL 694267 at *11, *citing LoPresti v. Terwilliger,* 126 F.3d 34, 42 (2d Cir.1997).

"'Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property.' " *Thyroff v. Nationwide Mut.*

*Ins. Co.,* 360 Fed.Appx. 179, 180 (2d Cir.2010), *quoting Seanto Exps. v. United Arab Agencies,* 137 F.Supp.2d 445, 451 (S.D.N.Y.2001) (Motley, D.J.); *see also Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 54 (2d Cir.1993).

Finally, " '[t]o state a claim of conversion, the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another [,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.' " *Soroof Trading Dev. Co., Ltd. v. GE Fuel Sys., LLC, supra,* 842 F.Supp.2d at 514, *quoting Lefkowitz v. Bank of New York,* 676 F.Supp.2d 229, 251 (S.D.N.Y.2009) (Marrero, D.J. adopting the Report and Recommendation of Dolinger, M.J.); *see also Goodman v. Port Auth. of New York and New Jersey, supra,* 850 F.Supp.2d at 376; *Seanto Exps. v. United Arab Agencies, supra,* 137 F.Supp.2d at 451.

44. Therefore, Defendant Malofeyev committed numerous repeated acts of conversion when (1) he unlawfully collected the rental profits of Plaintiff, without authorization, and (2) exercised dominion and a right of ownership over this property belonging to Plaintiff, (3) knowingly that Plaintiff had demanded the rent, and (4) that his demands were refused.

45. Plaintiff has been economically damaged as a result of Defendant's acts.

**WHEREFORE**, Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendants Malofeyev and $5,379,876.94 deposited at Sunflower Bank, NA:

(1) Declaring that the profits were unlawfully converted and further deposited by Malofeyev to the account at Sunflower Bank, NA;

(2) Declaring that Defendant Malofeyev utilized unlawful and wrongful acts in converting Plaintiff's profit to himself for his own financial benefit;

(3) Awarding Plaintiff damages in an amount of $575,000.00 which shall be collected from $5,379,876.94 deposited at Sunflower Bank, NA; and

(4) Awarding Plaintiff any other such relief as is deemed just and proper.

## COUNT II: CIVIL THEFT
### (Against Defendant Malofeyev)

46. Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

47. Plaintiff Ryzhov is a resident of the State of Florida.

48. Florida's civil theft statute, Florida Statutes § 772.11, affords a private cause of action for treble damages for a violation of Florida's criminal theft law. To state a claim under this statute, a plaintiff must allege that a defendant "(1) knowingly (2) obtained or used, or endeavored to obtain or use, [the plaintiff's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a) deprive [the plaintiff] of its right to or a benefit from the property or (b) appropriate the property to [the defendant's] own use or to the use of any person not entitled to the property." *United Tech. Corp. v. Mazer,* 556 F.3d 1260, 1270 (11th Cir.2009) (citing, *inter alia,* Fla. Stat. §§ 772.11, 812.014). As relevant here, "felonious intent" in this context requires that a defendant have, "prior to the commission of the act, an intent to commit a theft." *Rosen v. Marlin,* 486 So.2d 623, 625 (Fla.Ct.App.3d Dist.1986).

49. Here, Defendant Malofeyev (1) knowingly (2) from May 2012 to the present, continue to obtain and use Plaintiff's property, including, inter alia, the mentioned above rental profits from the trusted premises with (3) felonious intent, as to (4) permanently deprive Ryzhov of his right to the property, and that Defendant Malofeyev appropriated the property to his own use, (5) depriving Plaintiff of his rights to and benefits from the property.

50. Therefore, Defendant Malofeyev committed numerous repeated acts of civil theft.

**WHEREFORE**, Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendant Malofeyev:

(1) for his willful violation of Florida's Law;

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.

## COUNT III EXTORTION UNDER HOBBS ACT
### (against Defendant Malofeyev)

51. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). There are two elements to a Hobbs Act violation: wrongful means and wrongful objective. As the Second Circuit explains, "Extortion as defined in the Hobbs Act consists of the use of wrongful means to achieve a wrongful objective." *United States v. Clemente,* 640 F.2d 1069, 1076 (2d Cir.1981) (citing *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973)). The Supreme Court held in *Enmons* that a person employs "wrongful means" not necessarily by employing means that are illegal unto themselves, but by exploiting one of the means identified in the statute ("actual or threatened force, violence, or fear") to obtain property to which "the alleged extortionist has no lawful claim." 410 U.S. at 400, 93 S.Ct. at 1010; *Clemente,* 640 F.2d at 1076. Under the *Enmons* framework, when the objective is wrongful (i.e., to obtain property to which one "has no lawful claim"), then the means (e.g., exploitation of fear) is also wrongful. Stated another way, both elements of extortion occur whenever one exploits fear to obtain property to which one has no lawful claim.

Under the *Enmons–Clemente* construction of the Hobbs Act, Viacom must show (1) that plaintiff paid the consideration to defendants because defendants were intentionally exploiting plaintiff's fear and (2) that the consideration received by defendants constituted property to which defendants had no lawful claim.

52. Under the Hobbs Act, activities that are not inherently unlawful can constitute wrongful means of obtaining property. *See Clemente,* 640 F.2d at 1077–78 ("a broad spectrum of legitimate business transactions" can constitute wrongful means if used to obtain property to which no lawful claim exists); *United States v. Hyde,* 448 F.2d 815, 833 (5th Cir.1971) ("It is the wrongful use of an otherwise valid power that converts dutiful action into extortion."), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30

L.Ed.2d 745 (1972); *Deem v. Lockheed Corp.*, 749 F.Supp. 1230 (S.D.N.Y.1989) (client's threat to exercise "absolute right to terminate the attorney-client relationship" can constitute extortion if used as a means to obtain property to which client has no lawful claim).

53. Here, Defendant Malofeyev, acting in concert with other members of RICO Enterprise, having unlimited influence over the Russian law enforcement, prosecution, courts, and other government servants, in 2009 and in 2012, commenced two bogus criminal cases against Chernov and Fedorov. Under cover of these criminal cases or color of law, they retained physical control over the premises and collected rent, even though they knew for a fact that the court decision of 2011 ordered to return the premises to Aquamarine and that in April 2012, a relevant entry was made in the state register on the reinstatement of Aquamarine's ownership, and that Plaintiff was the legal trustee, or custodian, of the premises and owned the rights to the rental profits from it. However, Defendant Malofeev, through his stooges, instilled in Plaintiff a fear of shame criminal prosecution or other forms of reprisal if Plaintiff attempted to collect rent himself or proceed to manage the premises. In addition, to reinforce this fear, Defendant Malofeyev placed armed guards in the building to prevent Plaintiff from entering the premises.

54. Certainly, criminal prosecution is not an inherently unlawful means, but here, it was exploited to reach wrongful objectives. Namely, to inspire fear in Plaintiff in order to keep him from collecting profits, to which he was entitled by law and had to be free from the fear he was quelling by giving the profits to Defendant Malofeev and his co-conspirators.

55. Thus, since May 2012, Defendant has been obtaining Plaintiff's rental profits with Plaintiff's consent because Defendant induced Plaintiff to fear by wrongful use of bogus criminal cases, the application of force by his guards, or by the commission of crimes by his conspired criminals.

56. The effect of this extortion was also amplified by Defendant Malofeev through the use of a smear campaign, which carried countless false and defamatory statements. Through this campaign, Defendant

attempted to instill fear in Plaintiff and to silence him about the crimes committed by members of RICO Enterprise.

**WHEREFORE**, Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendant Malofeyev:

(1) for his willful violation of Federal Law;

(2) in an amount of damages to be determined at trial;

(3) awarding Plaintiff any other relief deemed just and proper.

### COUNT IV UNJUST ENRICHMENT
### alternatively to Counts I and II
### (against Defendant Malofeyev)

57. "Under New York law, a plaintiff may prevail on a claim for unjust enrichment by demonstrating '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.' " *Nordwind v. Rowland,* 584 F.3d 420, 434 (2d Cir.2009) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.,* 448 F.3d 573, 586 (2d Cir.2006)). As the New York Court of Appeals recently explained,

> [U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled. An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

*Corsello v. Verizon New York, Inc.,* 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1185 (2012) (internal quotations omitted); *see Badia,* 2015 WL 1258218, at *3 n. 2 (declining to grant a motion for default judgment on a duplicative claim of unjust enrichment where the court had granted a claim for common law fraud).

58. Here, even assuming that the members of RICO Enterprise, in Counts I and II, acted of their own accord in collecting Plaintiff's rental profits or stealing his assets. Nevertheless, they paid a portion of these illicit proceeds to Defendant, and he accepted them and deposited them into his bank accounts, even though he knew that he was not entitled to any legitimate claim to them.

59. As a result of Defendant's unauthorized dominion over the unlawfully transferred profits and illicit proceeds of Plaintiff as set forth in detail above, Defendant unjustly enriched to the detriment of Plaintiff. Defendant had no legal or equitable rights to Plaintiff's profits and assets.

60. It is inequitable and against good conscience to allow Defendant to retain any benefit from Plaintiff's profits and assets in his account at Sunflower Bank, NA.

**WHEREFORE**, Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendant Malofeyev and $5,379,876.94 deposited at Sunflower Bank, NA.

(1) Awarding Plaintiff damages in an amount to be determined at trial which shall be collected from 379,876.94 deposited at Sunflower Bank, NA; and

(2) Awarding Plaintiff any other such relief as is deemed just and proper.

### COUNT V: DEFAMATION PER SE
### (Against Defendants Malofeyev and Tsargrad)

61. Plaintiff has been practicing law in Russia since 2005, and by 2009, his law firm had become one of the most prominent in his region in Russia and even abroad. Business clients often have invited Plaintiff and his law firm to represent them in complex cases, while judges and academics asked him to participate in discussing some legal issues. Plaintiff spent part of his income and time helping the poor or the unjustly offended. All that led Plaintiff to develop a reputation as a respected lawyer and good Samaritan.

62. Among many others, Plaintiff's clients were Aquamarine LTD ("Aquamarine") and its shareholders, whom Plaintiff represented in several proceedings against RICO Enterprise's alter egos, including Equesman, which eventually lost those cases. They, as parties in those cases, received copies of

the court judgments, which were also largely available through the courts' websites. However, after losing the cases and seeking retaliation against Plaintiff as well as a reversal of the court judgments, RICO Enterprise additionally employed General Drymanov to persecute Plaintiff. The General, acting in conspiracy with RICO Enterprise commenced a bogus criminal case against unknown persons, claiming that Equesman was a victim of fraud because it lost those cases.

63. Further, RICO Enterprise began to exploit the criminal case as a vehicle to harass Ryzhov in order to seize his and his clients' property. However, this approach began to disturb many people who knew the Plaintiff personally, and they began to demand to halt this persecution. To break this backward, RICO Enterprise launched a smear campaign, particularly through Defendant Malofeev's media outlets. In this campaign, RICO Enterprise massively and continually published false and defamatory statements about Plaintiff, inspiring the general public to believe that Plaintiff had committed crimes or dishonest acts. At the same time, RICO Enterprise blocked any attempt of Plaintiff to appeal those publications or to publish his viewpoint. For example, in the summer of 2015, a lawyer's online media, Pravorub.ru, published two publications – two opinions of the Plaintiff and his associate – after which RICO Enterprise raided the office of the media with police officers armed with automatic weapons and confiscated all of its computers and servers. *See* https://pravorub.ru/cases/48522.html

64. In 2018, General Drymanov and his co-conspirators were arrested on charges of extorting property from another lawyer's clients. Consequently, other media began constantly interviewing Ryzhov, in which he spoke out about RICO Enetrprise's racketeering activities. To obscure the revealed truth and force Plaintiff to be silent, RICO Enterprise decided to involve television, including Tsargrad TV.

65. On or about September 06, 2018, Malofeyev ordered Tsargrad to post a video report and an online article *EVGENY RYZHOV'S BLACK CREDITORS,* on the Internet, Tsargrad's website and trough other media in Ecosystem. That video and article contained many defamatory statements, accusing Plaintiff of

committing numerous crimes himself and as a part of an organized crime group, committing numerous dishonest acts and so on. *See* Ryzhov Decl. ¶ 3, which was attached to the initial complaint ECF 1. The exert of the article and video below:

> "Simple arithmetic of the MFC [micro-financial company] owner Evgeny Ryzhov and his accomplices. Just a few manipulations with the borrower's credit contract, and someone else's dwelling is in his pocket"; "He concluded microloan contracts, gave people small amounts of money ..... Then ... changed the middle sheets of the contract, where the amount was specified. And when people came and reimbursed him for everything they took, he said: That's good, of course, but where's the rest of the money?"; "All in all, Evgeny Ryzhov owns 27 properties. Ryzhov placed marginal people in his apartments, which created unbearable living conditions for their former occupants."; "Ryzhov's vanity knows no boundaries. In his greed he spared no expense, and even had his eye on a fleet of garbage trucks belonging to a company that specializes in waste disposal"; "Ryzhov and Co. did not limit themselves to falsifying documents... Their methods of weaning went beyond the law and human morality.  "They had pressure methods on me and my family like in the wild 90s," uttered Mr. Durandin. [*an individual mentioned in ¶ 35 of this Amend Compl.*] - On February 23rd they congratulated me on the holiday by hanging a grenade with a string from the gate of my house, which turned out to be a training grenade, but it did tickle my nerves. Because before that there had been SMS of different threatening kind - "give it back to me and we'll leave you alone, but you also have children and grandchildren - keep in mind" and "reveling in impunity, the ambitious Mr. Ryzhov decided to take the capital. The black creditor took a swing at a three-story building in the heart of Moscow, across from the Cathedral of Christ the Savior."; "When it's getting really tough, Ryzhov's heels blazed. He was captured on Sheremetyevo Airport's surveillance cameras, where he, yawning, strides through the terminal building with a small gym bag on his shoulder, passes through security, and follows to the boarding gate. Half an hour later, the plane will take him to the sunny shores of Miami"; "Being on an international wanted list, Ryzhov continues to run his OCG [organized crime group] from Miami"; "A shocking story. We feel sorry for the people who got in the way of Evgeny Ryzhov... Meanwhile, the courts of Nizhny Novgorod sided with the black creditor for eight years, stamping one after another dismissal of civil lawsuits." (emphasized added)

Additionally, that video reportage used Ryzhov's own video, which was stolen from his laptop or cloud account, and he had never permitted Tsargrad or someone else to use it publicly.

66. On or about September 23, 2018, through Facebook, Plaintiff contacted Elena Sharoykina ("Sharoykina"), the CEO of Tsargrad, and demanded to remove that defamatory video and article because they caused his moral suffering and also caused damages to his business reputation.

67. On or about September 25, 2018, Plaintiff had a phone conversation with Sharoykina and again demanded Tsargrad remove that defamatory video and article. In response, she suggested to email Plaintiff's demand to Tsargrad to discuss it with Malofeyev. Plaintiff followed the suggestion and sent his demand the same day.

68. On or about September 28, 2018, Plaintiff received a reply from Tsargrad, refusing to remove the video and article.

69. On October 11, 2018, Malofeyev ordered Tsargrad to post another article *A WARM PLACE: THE U.S. WELCOMED THE FRAUDSTER RYZHOV WITH PRISON,* and disseminate it through Ecosystem. This article repeats the slanderous statements from the September 06, 2018 article and also transmits threats of life imprisonment. *See* Ryzhov Decl. ¶ 9, which was attached to the initial complaint ECF 1. The exert of the article below.

> "Evgeny Ryzhov, a lawyer from Nizhny Novgorod, who escaped to the United States from criminal prosecution for real estate fraud, spoke at a forum of "political refugees." He complained about his difficult fate, his imprisonment in a US prison, persecution by Russian authorities, and Interpol.
>
> Tsargrad previously covered a large-scale scheme by Evgeny Ryzhov, which gives him every right to be considered one of the most successful swindlers in Russia in recent times. In the disposal of TV channel there are materials of criminal case initiated against the fugitive lawyer. Despite the commencement of the investigation, Ryzhov managed to escape responsibility and hide in the US.
>
> The lawyer there plans to make a good fortune with his capital. Until that happens, he is active in the media, taking part in various forums and meetings where he talks about his difficult fate and allegedly unfounded persecution by the Russian authorities.
>
> The paradox of the situation is that "normal" criminal elements prefer to lie low and not stir the waters. Ryzhov, on the other hand, tries to make more noise. … On October 9 (the night of October 10, Moscow time) in Miami, Evgeny Ryzhov spoke at a meeting

called "Business Refugees from Russia – Problems and Solutions" organized by Rubic, a publication devoted to contemporary immigration to the United States. At the meeting, the23uccessfull businessman and lawyer tried on the mask of an innocent convicted hero who, for some reason, is persecuted in Russia for "political reasons" when he steals millions.

**"U.S. Authorities Show Concern."**

The discussion was moderated by Ekaterina Panova, editor-in-chief and founder of the Rubic portal. In her opening remarks, she ironically stated that she was happy to introduce the audience to "select criminals, according to the Kremlin and Russian propaganda. The moderator stressed that she herself was Ukrainian, had never lived in Russia, and on that very basis claimed to be objective.

When the microphone was passed to Ryzhov, he told his story. The lawyer's speech, of course, did not include his microfinance organization, through fake contracts with which he "snatched" apartments from Nizhny Novgorod residents and put them on the street, nor did it mention the attempt to seize the sanatorium "Automobilist" and other similar cases.

But Ryzhov talked about the conflict he had with the former head of the State Investigative Committee for Moscow, Alexander Drymanov, who has already been arrested in Russia on charges of corruption. At the same time, Ryzhov noted that he himself was not guilty of anything, just someone very much wants to take real property from his former clients.

According to Ryzhov's version, Drymanov allegedly ordered his abduction. The lawyer managed to escape via the fire escape, then made his way to Europe, and from there, to the United States. There, however, he did not receive a very warm welcome: he was arrested and imprisoned.

…

Ryzhov's gang enlisted the help of bailiffs, who came to "help seize" the property with a group of 15 special forces.

The ability of fugitives like Ryzhov to portray themselves as victims is amazing! And the U.S. willingly believes in the trend of political prisoners who are imprisoned because of "Kremlin slanders" and persecuted abroad.

We can only hope that the U.S. will really look into Ryzhov's case and return him to the "high-security pioneer camp" or, better yet, extradite him to Russia to face punishment. This would show Interpol and the world at large that the U.S. legal system is doing its job well, and not just covering up for hardened criminals.

In Russia, Ryzhov could face up to 10 years in prison under the article on fraud. However, it is possible that the investigation will still see signs of criminal association in his actions. For this article 210 of the Criminal Code provides even harsher punishment, which is adequate to the greed and indifference to the fate of people

deceived by Ryzhov. Under this article, one of the biggest swindlers of the last decade in Russia can go to jail for life.

70. As Tsargrad itself claimed in July 2016, its audience was 38.5 million viewers, and after the launch in 2017 of live streaming broadcasts in the channel's official social media groups: Facebook, Vkontakte, and YouTube, the reach has grown by 440 percent, that is, to about 150 million viewers per month. At the same time, Malofeyev expressed confidence that Tsargrad_Tv's audience will continue to grow: "Russian World reaches hundreds of millions of people in Russia and beyond. The channel's staff work daily to make sure that it is interesting to everyone who considers themselves Russian anywhere in the world." Then, Malofeyev Further, Malofeyev began publishing defamatory publications against Plaintiff through his other numerous online media outlets in order to avoid direct association with his name. The total number of such negative publications reached about 1,000,000.

71. By engaging in the conduct set forth above, Defendants intentionally, maliciously and irreparably damaged Ryzhov's reputation, personally and professionally. The content of the Defendants article and video's expressions were false and contradicted to the courts' decisions that entered into force in which Ryzhov engaged.

72. Under New York law, a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability.

73. Defendants Malofeyev and Tsargrad are liable for defamation because they published (1) written false statements that tended to expose Ryzhov to public contempt, hatred, ridicule, aversion, or disgrace, (2) published it without privilege or authorization to a third party, (3) amounting to fault as judged by, at a minimum, a negligence standard, and (4) Defendants' statements were false, and thereby (5) they constitute defamation *per se*.

74. Defendants Malofeyev and Tsargrad committed defamation *per se* as its published statements charged Ryzhov with one or more serious crimes and tended to injure him in his trade, business and profession.

75. Tsargrad publication and video reportage of September 06, 2018 was disseminated via the Internet, including YouTube, and included false claims that Ryzhov committed numerous crimes, including frauds, and was dishonest with his counterparties.

76. Said article and video, consisting of numerous false statements were published online and remain available for viewing by consumers of Internet YouTube, including all in the U.S.

77. Tsargrad's statements have exposed Ryzhov to public contempt, hatred, ridicule, aversion and disgrace as demonstrated by the public's comments on the Tsargrad website and websites which reposted the article and video.

78. The said statements are categorically false as Ryzhov engaged in collection procedures or in transactions consistent with the Russian laws, which were confirmed by the Russian courts in adversary proceedings.

79. Publication of the identified statements constitutes defamatory *per se* as it accuses Ryzhov of the commission of serious crimes, acts of moral turpitude and tends to injure him in his trade, business and profession, as an attorney, which requires the confidence and trust of potential clients, actual clients, courts, colleagues and the general public.

80. The false and defamation statements were repeatedly and maliciously uttered by Defendants Malofeyev and Tsargrad with knowledge of their falsehood.

81. These statements were made with actual malice and an intent to harm Ryzhov's reputation, as demonstrated by many factors, including that those statements contradict the courts' findings and conventional logic.

82. The content and circumstances underlying Tsargrad's defamatory statements constitute outrageous conduct, which is malicious, wanton, reckless and perpetrated in willful disregard for Ryzhov's rights, thus warranting punitive damages.

83. The events underlying in this case, many of which are established as a matter of law and/or otherwise uncontroverted, constitute extraordinary circumstances and there is no adequate remedy at law which can mitigate and prevent further irreparable injury to Ryzhov except for an injunction requiring Defendants Malofeyev and Tsargrad to remove any and all published by themselves or disseminated of their articles and videos that accuse plaintiff Ryzhov of stealing, fraud or any other criminal or unprofessional acts, and the injunction should prohibit Defendants Malofeyev and Tsargrad from publishing any such statements on any medium in the future.

84. Defendants Malofeyev and Tsargrad's unlawful conduct makes them liable to Ryzhov for compensatory and punitive damages in an amount exceeding $75,000.

**WHEREFORE**, Plaintiff Ryzhov prays that this Honorable Court (1) accept jurisdiction over this matter, (2) hear and decide this matter; (3) order Tsargrad to remove its statements about Ryzhov from the Internet including but not limited to from its website and YouTube through the present date; (4) temporarily, preliminarily and permanently enjoin Tsargrad from uttering, writing, publishing or otherwise spreading false statements concerning Plaintiff, his agents, assigns, those acting in concert with him or family members that in any way state or imply that Ryzhov engaged in unlawful, unethical or unprofessional conduct relating to all cases that have been adjudicated with Ryzhov's participation, (5) award Plaintiff compensatory damages for the embarrassment and other harms caused him by the referenced publications; (6) award plaintiff punitive damages for the malicious, wanton, reckless and willful violations of plaintiffs rights in which defendant has repeatedly engaged and (7) enter any other order for relief as required by law or equity, including the reasonable costs and disbursements arising from this litigation.

## COUNT VI: CONSPIRACY TO COMMIT A TORT
### (Against Defendants Malofeyev and Tsargrad)

85. A claim for "defamation" is an umbrella term that incorporates the "twin torts of libel and slander."

Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001) (citations omitted). "Defamation is the injury to one's

reputation either by written expression, which is libel, or by oral expression, which is slander." Biro v.

Conde Nast, 883 F.Supp.2d 441, 456 (S.D.N.Y. 2012) (citation omitted). "The elements of a cause of

action [to recover damages] for defamation are a false statement, published without privilege or

authorization to a third party, ... fault ... and ... either [causing] special harm or [constituting] defamation

per se." Lan Sang v. Ming Hai, 951 F.Supp.2d 504, 517 (S.D.N.Y. 2013) (alternations in original)

(quoting Epifani v. Johnson, 65 A.D.3d 224, 233, 882 N.Y.S.2d 234 (App. Div. 2d Dep't 2009))/

86. New York law does not recognize civil conspiracy to commit a tort as an independent cause of

action. Instead, such a claim stands or falls with an underlying tort. *Hebrew Inst. for Deaf & Exceptional*

*Children v. Kahana*, 57 A.D.3d 734, 870 N.Y.S.2d 85, 86 (2008). Allegations of conspiracy are useful

only as a pleading tool and permitted only to connect the actions of separate defendants with an otherwise

actionable tort. *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 510 N.Y.S.2d 546,

503 N.E.2d 102, 103 (1986).

87. The elements of a conspiracy are: (1) a corrupt agreement between two or more parties, (2) an

overt act in furtherance of the agreement, (3) the parties' intentional participation in furtherance of a plan

or purpose, and (4) resulting damage or injury. *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d

Cir.1986) (citing *Suarez v. Underwood*, 103 Misc.2d 445, 426 N.Y.S.2d 208, 210 (Sup.Ct.1980)). A

conspiracy claim requires allegations that the defendant actually knew the wrongful nature of the primary

actor's conduct and actually intended to participate in it. *See Pittman by Pittman v. Grayson*, 149 F.3d

111, 122–23 (2d Cir.1998); 20 N.Y. Jur. 2d *Conspiracy—Civil Aspects* § 11 ("[A] person without

knowledge of the alleged objective cannot be considered a conspirator.").

88. Until 16 March 2022, Russia was a member of the European Convention on Human Rights. The provisions of that Convention as well as the construction of the law were mandatory, in particular Article 6, Right to a fair trial, and Article 10, Freedom of Expression. The European Court of Human Rights, in its guides[5], has explained the following:

> 113. Freedom of expression, guaranteed by Article 10 of the Convention, includes the freedom to receive and impart information. Article 6 § 2 cannot therefore prevent the authorities from informing the public about criminal investigations in progress, but it requires that they do so with all the discretion and circumspection necessary if the presumption of innocence is to be respected (*Allenet de Ribemont v. France*, § 38; *Fatullayev v. Azerbaijan*, § 159; *Garycki v. Poland*, § 69). The Court has emphasised the importance of the choice of words by public officials in their statements before a person has been tried and found guilty of a particular criminal offence (*Daktaras v. Lithuania*, § 41; *Arrigo and Vella v. Malta* (dec.); *Khuzhin and Others v. Russia*, § 94).

> 114. As to press campaigns against an accused or publications which contain accusatory aspects, the Court has noted that these may prejudice the fairness of a trial by influencing public opinion and, consequently, the jurors called upon to decide on the guilt of an accused (*Khuzhin and Others v. Russia*, § 93).

89. That is, even assuming that Russian officials wanted to notify the general public that Plaintiff was charged, it should have been done with the importance of the choice of words. However, Defendants Malofeyev and Tsargrad, realizing that officials should have to follow these statutory prescriptions and therefore such information would not defame Plaintiff's reputation, conspired among themselves and with other members of RICO Enterprise, including Zhukov and Durandin, and began publishing false and defamatory publications in mass, the purpose of which was to damage Ryzhov's reputation, personally and professionally, and to encourage the public to believe the Plaintiff guilty and prejudge the assessment of the facts by the competent judicial authority.

90. Defendants also knowingly and intentionally disseminated their publications over the Internet so that they would reach the public and authorities around the globe, including the United States authorities. In Tsargrad publication of October 11, 2018, Defendants directly appeal to U.S. authorities demanding

---

[5] *Guide on Article 10 of the European Convention on Human Rights*, ECtHR, updated on 31 August 2022 https://www.echr.coe.int/documents/guide_art_10_eng.pdf

that Plaintiff Ryzhov be returned to Russia, "[H]e [must be incarcerated] … [in]to the "pioneer high-security camp," (meaning maximum-security prison) or better yet - be extradited to Russia, where he will be punished accordingly. This would show the U.S. legal system to Interpol and the world at large that it is doing its job, rather than covering up for hardened criminals." (emphasized added). In this way, being aware that Ryzhov's asylum case was pending, Defendants attempted to affect the fairness of the proceedings, as they were used to doing in Russia.

91. Here, (1) Defendants corruptly agreed between themselves and other members of RICO Enterprise, and (2) committed numerous of overt acts in furtherance of the agreement, (3) which were Defendants' intentional participation in furtherance the overall goal of RICO Enterprise to which they were parties, and (4) this conduct resulted in damages and injury to Plaintiff Ryzhov.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Malofeyev and Tsargrad:

(1) for their willful violation of New York Law;

(2) in an amount of damages to be determined at trial;

(3) awarding Plaintiff any other relief deemed just and proper.

### COUNT V: TORTURE
### (Against Defendant Malofeyev)

92. U.S. Federal and State statutes prohibited acts of torture occurring within the United States.

93. Torture is defined in the Torture Victim Protection Act as (1) … any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering … , whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual … a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, … and (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from — (A)

the intentional infliction or threatened infliction of severe physical pain or suffering; … (C) the threat of imminent death; or (D) the threat that another individual will imminently be subjected to death, ... .

94. The U.S. Department of State annually reports that Russia has one the highest levels of significant human rights issues, including extrajudicial killings and attempted extrajudicial killings; enforced disappearances by or on behalf of government authorities; pervasive torture by government law enforcement officers that sometimes resulted in death; harsh and life-threatening conditions in prisons; widespread corruption at all levels and in all branches of government; while the government failed to take adequate steps to identify, investigate, prosecute, or punish most officials who committed abuses and engaged in corruption, resulting in a climate of impunity.

95. RICO Enterprise created an agency relationship with Malofeyev, a covert agent of Russian Government, and other state agents to use violence to inspire fear in Plaintiff and mental pain to suppress his opposition and divest him of the assets belonged to his clients and him.

96. Defendant Malofeev provided RICO Enterprise members with unrestricted access to Ecosystem to transmit direct and repeated statements to Plaintiff and his supporters that his fate was sealed and that all that remains was to apprehend Plaintiff abroad and return him to Russia to object him torture during a prolong incarceration. Given that RICO Enterprise masterminds, such as Malofeev, had virtually unlimited influence over law enforcement agencies, prosecution, and courts in Russia, they did not even doubt that the courts could render otherwise. It is well known and confirmed by numerous reports, including those from the U.S. State Department, that there is a 100% probability that those who have been imprisoned in Russia will be tortured. The number of publications circulated and replicated in the amount of about 1,000,000 made it impossible for Plaintiff to avoid them, as Plaintiff's friends, acquaintances, and clients either forwarded him links to these publications or called to discuss the content of the publications with Plaintiff. Defendant Malofeev and his accomplices not only developed and transmitted threats to Plaintiff but also carried them out through a network of Russian government agents and criminals

presented in the US, as well as through Russian diplomatic missions in the US, which staff abused their positions and used official channels to transmit false statements to US authorities demanding Plaintiff's expulsion to Russia, but in fact seeking to abduct Plaintiff under the color of law. And all this was happened openly and on U.S. soil. Thus, at all relevant times, Plaintiff was within the physical control of these RICO Enterprise agents, even being in the U.S.

97. Similarly, Defendant Malofeev, acting in concert with RICO Enterprise, deprived Plaintiff of the income he had obtained in the U.S. from renting out his realty in Russia. Defendant Malofeyev seeking to starve Plaintiff to death or force him to come crawling back to Russia deployed corrupt government agents who threw all tenants out of Plaintiff's realty and prohibited Plaintiff from using it while leaving Plaintiff to pay taxes and maintenance out of his pocket. By August 2020, Plaintiff was deprived of all his income from Russia to which he was legally entitled; thereby, the prospect of starving to death became extremely real for him. Plaintiff, who has developed heightened sensitivity as a result of his experience of being abducted and tortured, has again suffered another attack of intense mental pain and anguish from the threat of imminent death of his family and himself because of these acts of Defendant Malofeyev.

98. As stated above, Defendant Malofeev was directly involved in the propagation of defamatory publications against Plaintiff, the number of which reached 1,000,000. This numerosity had no legal justification and was designed only to methodically and continuously achieve Plaintiff and subject him to mental torture, especially in circumstances where Russian law contains no remedies, such as injunctions against future publications, and when Plaintiff, an experienced attorney, was deprived of access to the Russian courts and the right to fair trial to challenge these publications, the number of which made such challenges also impossible.

99. In 2019, the Miami Immigration Court ("IC") adjudicated Plaintiff's asylum application, which contained the allegations of torture set forth in this Complaint, and the IC found those allegations to be proof that Plaintiff had been subjected to torture. Insofar as Defendant's publications reached the IC and

were judicially reviewed, Defendant Malofeev is barred from challenging them under the doctrine of *res judicata.*

100.    In *Franchise Tax Bd. of California v. Hyatt*, 538 U.S. 488, 123 S. Ct. 1683, 155 L. Ed. 2d 702 (2003) The Supreme Court of the United States held: "Full Faith and Credit shall be given in each … judicial Proceedings of every other State. … Whereas the full faith and credit command "is exacting" with respect to "[a] final judgment ... rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment," *[Baker v. General Motors Corp., 522 U.S. 222, 232,]* at 233, 118 S.Ct. 657,

101.    By committing torture Defendant Malofeyev and his co-conspirators acted under the color of authority of the Russian government.

102.    Citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp. 2d 633, 668 (S.D. N.Y. 2006), the Court in *Balcero* held that the standard for aiding and abetting is "(1) the principal violated international law; (2) the defendant knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation."[6] *Balcero* Order at 17.

103.    As to the first element, Defendant Malofeyev violated international law by committing torture himself or abetting and aiding to commit it state actors.

---

[6] Although Plaintiffs address herein the higher standard adopted by *Balcero*, their position is that the binding standard for aiding and abetting was stated by the Eleventh Circuit in *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005) as: (1) "one or more of the wrongful acts that comprise the claim were committed," (2) the Defendants "substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim," and (3) Defendants "knew that [their] actions would assist in the illegal or wrongful activity at the time [they] provided the assistance." This test is virtually identical to that adopted by the RESTATEMENT (SECOND) OF TORTS, § 876(b). Further, under international law, a similar aiding and abetting standard of knowing, substantial assistance has been applied since at least the Nuremberg cases. See, e.g., *U. S. v. Friedrich Flick, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10* (1952).

104.     As to the second element, Plaintiff alleges that Defendant Malofeyev, having a law degree and experience, had actual knowledge of what his acts could constitute torture and what effect they had on Plaintiff. However, Defendant Malofeyev not only failed to cease his illegal activity; but instead, he engineered, executed, and directed others to maximize the negative effect of torture on Plaintiff and his family.

105.     As to the third element, when Defendant established an agency relationship with Group, he acted with the intent to torture Plaintiff in order to further their conceived extortion of property from Plaintiff as well as assist the members of RICO Enterprise to retaliate against him for their failures in the court proceedings.

106.     As to the fourth element, Defendant's acts had a significant impact on the success of RICO Enterprise's overall goal, which became easily achievable without any possible opposition from Plaintiff. And RICO Enterprise reveled in its lust for revenge against Plaintiff, which they realized through the use of described torture, and the ruining of Plaintiff's reputation and his businesses in Russia.

107.     As to the fifth and final element, Malofeyev was totally aware and publicly admitted that the acts assisted the specific torture alleged herein. As alleged above Defendant Malofeyev had actual knowledge of what actions could constitute torture, when directed his subordinate and state actors to threat Plaintiff in one way or another. The methods of operations were precisely what Defendant and his accomplices expected to receive.

**WHEREFORE**, Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendant Malofeyev and grant the following relief:

(1) An order granting Plaintiff equitable relief permanently enjoining Defendant Malofeev from torturing Plaintiff in any form;

(2) An order awarding Ryzhov actual, punitive, and compensatory damages, as well as reasonable costs and attorney's fees; and

(3) Any other relief the Court deems just and equitable.

## COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant Malofeyev)

108.      This Court in *Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487 (S.D.N.Y. 2018), reviewed and offered a thorough analysis of when a claim for intentional infliction of emotional distress (IIED) can be satisfied. In particular, the Court held:

> To state a claim for IIED under New York law, a plaintiff must adequately allege: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *4 Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44, 47 (2d Cir. 2016). To form the basis of an IIED claim, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 702 (1993) ).
>
> [I]t is well established that where the crux of [a] complaint sounds in defamation, court[s] will refuse to allow a cause of action for emotional distress," because a plaintiff cannot "circumvent[ ] the restrictions on defamation claims" by styling his claim as one for IIED. *Croskey v. Med. & Tech. Servs., Inc.*, No. 05 Civ. 6641 (LMM), 2006 WL 2347816, at *3 (S.D.N.Y. Aug. 10, 2006) (citing *Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 111 A.D.2d 807, 490 N.Y.S.2d 553, 555 (2d Dep't 1985) ). Similarly, "courts have held that false statements or misrepresentations—even if intentionally made—do not rise to the level of extreme and outrageous conduct." *Baraliu v. Vinya Capital, L.P.*, No. 07 Civ. 4626 (MHD), 2009 WL 959578, at *12 (S.D.N.Y. Mar. 31, 2009) (citations omitted)
>
> In addition, "[c]ourts are reluctant to allow recovery under the banner of [IIED] absent a deliberate and malicious campaign of harassment or intimidation." *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 550 (2d Cir. 2009) (quoting *Cohn-Frankel v. United Synagogue of Conservative Judaism*, 246 A.D.2d 332, 667 N.Y.S.2d 360, 362 (1st Dep't 1998) ). To find such a campaign exists, "New York courts appear to require that plaintiffs allege either an unrelenting campaign of day in, day out harassment or that the harassment was accompanied by physical threats[.]" *Lawson*, 331 F.Supp.2d at 133 (quoting *Nunez v. A-T Fin. Info., Inc.*, 957 F.Supp. 438, 442 (S.D.N.Y. 1997) ); *see also Fleming v. Hymes-Esposito*, No. 12 Civ. 1154 (JPO), 2013 WL 1285431, at *9 (S.D.N.Y. Mar. 29, 2013) (dismissing an IIED claim based on "defamation,... numerous phone calls, and ... unannounced visits ... and [defendant's] refusal to leave after one particular visit"). When the alleged campaign is "based on 'abuse by defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff's interests... liability usually has rested on a prolonged course of hounding by a variety of extreme methods.' " *Fiorito v. Ramos-Kelly*, No. 10 Civ. 4645 (LAP), 2010 WL 4967976, at *3 (S.D.N.Y. Dec. 2, 2010) (quoting *Lopez v. City of NY*, 901 F.Supp. 684, 691 (S.D.N.Y. 1995) ).

109.      The present case is precisely that rare one in which Defendant Malofeev, a member of RICO Enterprise, has used his apparent power of ownership of countless online media resources to

produce and distribute on an ongoing basis publication defaming Plaintiff's reputation and dignity and the total number of such publications has reached 1,000,000. The smear campaign launched by Malofeyev has been going on for nearly a decade to harass Plaintiff, intimidate him, torture him mentally, and cover up the crimes being committed by RICO Enterprise against him. At the same time, Defendant's accomplices, members of RICO Enterprise, have already abducted Plaintiff and are attempting to do so again, regularly transmitting death threats and grievous bodily harm to Plaintiff.

110.    Such conduct by Defendant Malofeyev is outrageous and is carried out with the intent to cause severe emotional distress, and there is a causal connection between Defendant's conduct and Plaintiff's injuries and severe emotional distress, which requires constant medical attention. "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."

**WHEREFORE,** Plaintiff Ryzhov respectfully requests that this Honorable Court enter judgment against Defendant Malofeyev in an amount of $1,000,000:

(1) For his willful and intentional infliction of emotional distress upon Plaintiff;

(2) In any other amount of damages to be determined at trial;

(3) Any other relief the Court deems just and equitable.

## COUNT IX: MONEY LAUNDERING
### (Against Defendant Malofeyev)

111.    Plaintiff reasserts and incorporates by reference the allegations in paragraphs ¶¶ 26–56 above.

112.    Since May 2012, Defendant Malofeev, on his own or through his associates, has appropriated Plaintiff's profits from the premises entrusted to Plaintiff by his clients, and such profits amounted to at least $25,000 each month. As of 2015, the illegally obtained proceeds from Plaintiff's stolen assets were added to this, totaling several million dollars. At all relevant times, these illicitly obtained proceeds Defendant exchanged into US dollars, which were deposited in the bank accounts under

his control, including his shell companies in different jurisdictions. Then through numerous further transactions, Defendant has mixed them with other monies, including money earned legally by his companies or himself, and deposited them in offshore jurisdictions, including Seychelles, from where he subsequently transferred them to the US to acquire legitimate companies.

### *Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(B)(i)*

113.    Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i).

114.    Since May 2012, Defendant Malofeev has knowingly conducted financial transactions identified in paragraph 112 with monies stolen from Plaintiff's profits.

115.    At all relevant times, Defendant c directed these transactions through a maze of shell companies with the intent to launder and ultimately deposit these monies in one of the remote jurisdictions, such as the US. Defendant knew that the property in question was the proceeds of some form of illegal activity.

116.    The property involved in those financial transactions was in fact derived from specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7) — namely, the proceeds represented the monies stolen from Plaintiff's profits for the rental of his clients' premises, assigned to him as payment for services rendered by him, and later the proceeds received by Defendant from personal assets stolen from Plaintiff.

117.    Defendant Malofeyev knew the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i) and (c)(7) — namely, the property constituted the monies stolen from Plaintiff's profits for the rental of his clients' premises, assigned to him as payment for services rendered by him, and later the proceeds received by Defendant from personal assets stolen from Plaintiff.

118.    These financial transactions identified above affected interstate commerce and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; (b) moving funds by wire or other means that affected interstate or foreign commerce, or (c) using financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce.

### *Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(A)(i)*

119.    Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

120.    Defendant knowingly conducted the financial transactions identified in paragraph 112.

121.    Defendant knew the property involved represented the proceeds of some form of unlawful activity.

122.    The property involved in those financial transactions was in fact derived from specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7) — namely, the stealing of Plaintiff's profits and assets.

123.    Defendant had the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(A)(i) and (c)(7) — namely, continuing the criminal enterprise in which Defendant was a member.

124.    These financial transactions identified above affected interstate commerce and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; (b) moving funds by wire or other means that affected interstate or foreign commerce, or (c) using financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce.

### *Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)*

125.     Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A).

126.     Defendant knowingly transported, transmitted, or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States via the transactions identified in paragraph 112.

127.     Defendant did so with the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(A) and (c)(7)—namely, continuing the criminal enterprise in which Defendant was a member.

### *Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(B)(i)*

128.     Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C. §1956(a)(2)(B)(i).

129.     Defendant knowingly transported, transmitted, or transferred monetary instruments or funds from a place in the United States to or through a place outside the United States via the transactions identified in paragraph 112.

130.     Defendant did so knowing the monetary instruments or funds involved in the transportations, transmissions, or transfers represented the proceeds of some form of unlawful activity— described in this Complaint — and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(B)(i) and (c)(7); specifically, the pattern of racketeering activity of RICO Enterprise described herein.

### *Monetary Transactions in Property Derived from Unlawful Activity in Violation of 18 U.S.C. § 1957*

131.     Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C. §1957.

132.     Defendant engaged in monetary transactions in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(a) and (f)(3)—namely, namely, the stealing of Plaintiff's profits and assets described herein.

133.     These financial transactions affected interstate commerce and foreign commerce by: (a) depositing proceeds of specified unlawful activity in financial institutions in the United States; or (b) involving the use of financial institutions which are engaged in, or the activities of which affect, interstate or foreign commerce.

134.     These monetary transaction either finally took place in the United States within the meaning of 18 U.S.C. § 1957(d)(1) and § 3077.

### *Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C § 2314*

135.     Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C § 2314.

136.     Defendant transported, transmitted, or transferred goods, securities, or money, of a value of $5,000 or more—namely, the monies stolen from Plaintiff's profits and assets, as described in paragraph 112—in interstate or foreign commerce.

137.     Defendant did so knowing that the money was stolen, converted, or derived from the racketeering activities of RICO Enterprise, of which he was a member.

### *Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315*

138.     Defendant Malofeyev committed acts of money laundering in violation of 18 U.S.C. §2315.

139.     Defendant received, possessed, concealed, sold, or disposed of goods, securities, or money that is of a value of $5,000 or more and that crossed a State or United States boundary after being stolen,

unlawfully converted, or taken— namely, the monies stolen from Plaintiff's profits and assets, as described in paragraph 112.

140.    Defendant did so knowing that the money was stolen, converted, or derived from the racketeering activities of RICO Enterprise, of which he was a member.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Malofeyev and Tsargrad:

(1) for their willful violation of Federal Law;

(2) in an amount of damages to be determined at trial;

(3) awarding Plaintiff any other relief deemed just and proper.

### COUNT X: Violation of the RICO Act, 18 U.S.C. § 1962(c)
### (Against Malofeyev and Tsargrad)

141.    Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

142.    To establish a civil RICO claim, "a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.' " *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001) (quoting *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.,* 101 F.3d 900, 904 (2d Cir.1996)). The Second Circuit has held that a RICO plaintiff has two pleading burdens. *First,* a plaintiff "must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962, commonly known as criminal RICO." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983) (internal quotation marks omitted). To satisfy this burden, the plaintiff must allege the following "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Id.* (quoting 18 U.S.C. § 1962(a)-(c)). A

plaintiff must adequately allege these seven elements "before turning to the second burden—i.e., invoking RICO's civil remedies." *Id.* (citation omitted). To satisfy the second burden, a plaintiff "must allege that he was 'injured in his business or property by reason of a violation of section 1962.' " *Id.* (quoting 18 U.S.C. § 1964(c)).

### *The RICO Enterprise*

143.     Here Defendants, Relevant Nonparties listed in paragraphs 10 to 14, *supra*, and other co-conspirators employed by or associated with RICO Enterprise, currently unknown to Plaintiff are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise — RICO Enterprise, as detailed described herein — to divest innocent people of their assets through patterns of racketeering activity. Regarding the acts committed against Plaintiff, Defendant Malofeyev, being associated with RICO Enterprise, operated and managed its racketeering activity long before Plaintiff was designated as the next target. Once RICO Enterprise incarcerated Plaintiff's client, Mikhail Chernov, on bogus charges, in May 2012, Defendant Malofeyev, by using force, threats, and his ties with the Russian government, commissioned Oleg Zhukov in Plaintiff's clients' premises to illicitly collect rent and hand it over to Malofeyev. That rent was destined for Plaintiff for his services rendered to his clients, and thereby Plaintiff was lawfully entitled to his profits amounting to at least $25,000 each month. This conversion of Plaintiff's profits began at that time and continues to this day. Month after month, Defendant Malofeev, with his co-conspirators, acting at his direction, misappropriated the profits, ignoring Plaintiff's inquiries and knowing that he was not entitled to them, deposited them in the bank accounts of his shell companies and his ones, and commingled them with other monies obtained from other legitimate sources of income, thereby laundering the illicit proceeds across the globe through a variety of international banks, shell companies, and cryptocurrency exchanges, and finally harbored them in the US to acquire legitimate companies. In 2015, Defendant Malofeev, as part of RICO Enterprise, proceeded to divest Plaintiff of his assets and receive a portion of his criminal proceeds from it, ultimately

causing millions of dollars in losses to Plaintiff and putting his life and loved ones in danger. Throughout Plaintiff's gutting, Defendant Malofeyev exploited his media resources, including Defendant Tsargrad, to avoid liability for himself and RICO Enterprise, influence government agencies, harass and cause mental torture to Plaintiff, destroying his reputation and any ability to counteract.

144.     Thus, Defendant Malofeyev engaged in a coordinated campaign with RICO Enterprise of divesting Plaintiff of his profits and assets, laundering of criminal proceeds by employing numerous unlawful interstate and international financial transactions involving laundered funds, and harassing Plaintiff through his media empire gathered under Defendant Tsargrad.

145.     Defendants Malofeyev and Tsargrad conspired with RICO Enterprise to and did form an association-in-fact to misappropriate and launder Plaintiffs' profits and assets through a pattern of criminal activity for a common purpose within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

146.     Defendants Malofeyev and Tsargrad are associated with RICO Enterprise within the meaning of 18 U.S.C. § 1962(c). Each of their roles and acts is detailed herein.

147.     Beginning on or around May 2012 to the present, the association-in-fact of Defendants Malofeyev and Tsargrad and RICO Enterprise was in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

### *Pattern of Racketeering Activity*

148.     Defendants participated, directly and indirectly, in the conduct, management, or operation of RICO Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 8 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), as follows:

### *Conversion*

149.     Between May 2012 and February 2014, Plaintiff had ownership over profits derived from rentals of premises entrusted to him by his clients, which amounted to at least $25,000 per month, but

Defendant Malofeyev exercising an unauthorized dominion over the profits, committed twenty one acts of conversion, and the illicit proceeds were deposited in a bank account of his shell company in Seychelles, and then in March 2014 were invested, among others his monies totaling in $10 million in shares of Strategic Growth Bancorp, a bank located in Texas. This Malofeyev's interest became blocked after the Department of Treasury's Office of Foreign Assets Control ("OFAC") designated him for sanctions in December 2014, and the investments ended up in a bank account at Sunflower Bank, or $5,379,876.94 in United States Currency Formerly on Deposit in Sunflower Bank.

150.     After February 2014, Defendant Malofeev, as a member of RICO Enterprise, continued to commit acts of conversion of Plaintiff's assets and profits, but for now, the location of these illicit proceeds remains unclear.

### *Extortion*

151.     Here, as in *Chevron Corp. v. Donziger*, 871 F.Supp.2d 229, 257 [S.D.N.Y.2012], Defendant Malofeyev actively participated in the design and implementation through his media, including Defendant Tsargrad, of a smear campaign against Plaintiff for the purpose of extortion, namely to transfer his property to members of the RICO Enterprise, as well as to avoid any public statements testifying about the unlawful acts of RICO Enterprise members and public officials, including judges, law enforcement officers, and high-ranking government officials, who were corrupted by the enterprise. In addition, as in *Chevron Corp. v. Donziger*, Russian officials recruited and directed by RICO Enterprise repeatedly made false statements to U.S. authorities, seeking the removal of Plaintiff to Russia, indeed abduction under the color of law, claiming that Plaintiff had committed a crime there, knowing it to be untrue. Defendant Tsargrad directly addressed U.S. authorities in its publications, provoking them to do justice in a way that would only benefit RICO Enterprise. Other RICO Enterprise members, such as a subordinate of General Drymanov, who repeatedly called Plaintiff in the United States in 2016 and extorted a ransom of

$3,000,000 to stop prosecution or another who went even further; in 2017, he arrived in Miami and extorted from Plaintiff assets belonging to his clients and him in "exchange" for ceasing persecution.

See. *Black v. Ganieva*, No. 21 CIV. 8824 (PAE), 2022 WL 2354916 (S.D.N.Y. June 30, 2022) ([D]efendant Donziger's conduct pled as extortion consisted of "a multi-faceted, extortionate scheme" including bringing litigation, "intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges, all for the purpose of coercing Chevron into paying to stop the campaign against it." 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012) (internal quotation marks omitted)

### *Torture*

152.    As it held in *Pierre v. Gonzales*, 502 F.3d 109 (2d Cir. 2007) "[T]he United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering...." 136 Cong. Rec. S17,486–01, S17,491 (1990); *see also* Convention against Torture, Declarations and Reservations. The FARRA regulations use the wording of this understanding: "In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 208.18(a)(5).(internal quotation omitted)

153.    Defendant Malofeyev, acting in concert with RICO Enterprise, deliberately designed and implemented the smear campaign through his media, including Tsargrad, so that the false publications would reach Plaintiff anywhere in the world, via wire and Internet, and cause Plaintiff mental pain by the inflammatory level of lies contained in those publications. The number of publications circulated and replicated in the amount of about 1,000,000 made it impossible for Plaintiff to avoid them, as Plaintiff's friends, acquaintances, and clients either forwarded him links to these publications or called to discuss the content of the publications with Plaintiff, so Plaintiff had no way to avoid them. At the same time, the negative effect of these publications was amplified by the fact that Plaintiff could not challenge them in

court because Russia's disinformation and propaganda ecosystem, of which Malofeev is one of the founders and the holder, was actually deployed against Plaintiff.

### *Money Laundering*

154.     Since May 2012, Defendant Malofeyev has been involved in the scheme of conversion of Plaintiff's profits and assets and their further laundering. This scheme lasts over several years, and the laundering allows it to continue for longer than it otherwise would have. A portion of the laundered proceeds stolen from Plaintiff have ended up in an account at Sunflower Bank, US, among $5,379,876.94. Defendant Malofeyev, acting in concert with other accomplices of RICO Enterprise, knowing that he had no legitimate grounds to claim the profits and assets of Plaintiff, still took them over and further understanding that the proceeds were of criminal origin, laundered them by means of international transactions through a network of shell companies under his control, causing damage to Plaintiff.

### *Nature of Pattern of Racketeering*

155.     Defendants committed a substantial number of related predicate acts over an extended period of time: the predicate acts enumerated at paragraphs 149 to 154, *supra*. Their commission of these predicate acts is part of a general course of business of RICO Enterprise and will continue unless and until they are prevented from committing such acts.

### *Injuries to the Plaintiffs*

156.     Plaintiff was, and continue to be, injured by reason of Defendants' violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated in paragraphs 149 to 154, *supra*.

157.     The injuries to Plaintiff include the continued deprivation of monies and assets taken from Plaintiff by means of RICO Enterprise Scheme, in which Defendants actively participate, and by significant legal fees and related costs in attempting to address the unlawful conduct and recover what rightfully belongs to Plaintiff.

158.     The injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of the violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated at paragraphs 149 to 154, *supra*. Plaintiff has been and will continue to be injured in an amount to be determined at trial.

**WHEREFORE**, Pursuant to 18 U.S.C. § 1964(c), Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendants Malofeyev and Tsargrad:

(1) for their willful violation of Federal Law;

(2) in an amount of treble damages plus costs and attorneys' fees from Defendants Malofeyev and Tsargrad;

(3) awarding Plaintiff any other relief deemed just and proper.

### COUNT XI: RICO Conspiracy, 18 U.S.C. § 1962(d)
### (Against Malofeyev and Tsargrad)

159.     Plaintiff incorporates into this Count the allegations in paragraphs 26 to 140.

160.     Defendants violated 18 U.S.C. § 1962(d) by conspiring with RICO Enterprise and each other to violate 18 U.S.C. § 1962(c).

161.     In connection with the pattern racketeering activity engineered by Defendant Malofeyev with RICO Enterprise, Defendants agreed to accomplish an unlawful scheme to divest Plaintiff of his profits and assets, subject him to torture and persecute him. These Defendants' acts constitute a pattern of racketeering activity as detailed in this Complaint, *supra*.

162.     Defendants agreed to the overall goal of RICO Enterprise and conspired to commit personally at least two acts of racketeering, specifically the predicate acts enumerated in paragraphs 149 to 154, *supra*.

163.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Plaintiff has been injured in his business and property as set forth in paragraphs 156 to 158, *supra*.

**WHEREFORE**, Pursuant to 18 U.S.C. § 1964(c), Plaintiff Ryzhov requests that this Honorable Court enter judgment against Defendants Malofeyev and Tsargrad:

(1) for their willful violation of Federal Law;

(2) in an amount of treble damages plus costs and attorneys' fees from Defendants Malofeyev and Tsargrad;

(3) awarding Plaintiff any other relief deemed just and proper.

### COUNT X: CONSTRUCTIVE TRUST
### (against $5,379,876.94 IN UNITED STATES CURRENCY FORMERLY ON DEPOSIT IN SUNFLOWER BANK, N.A. ACCOUNT 1101996560, HELD IN THE NAME OF "OFAC BLOCKED ACCOUNT MALOFEYEV")

164.       Plaintiffs re-allege and incorporate by reference the allegations set forth in each preceding paragraph as if rewritten herein.

165.       A constructive trust will be imposed "when property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 380–81 (1919). Generally, there are four requirements for the imposition of a constructive trust: (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment. *Sharp v. Kosmalski,* 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721, 723 (1976). Because the ultimate purpose of a constructive trust is to prevent unjust enrichment, however, these factors "are simply guidelines and their rigid application is not required." *Matter of Estate of Knappen,* 237 A.D.2d 677, 655 N.Y.S.2d 110, 111, *leave to appeal denied,* 90 N.Y.2d 802, 660 N.Y.S.2d 712, 683 N.E.2d 335 (1997). Even the complete absence of any fiduciary relationship between a debtor and a creditor does not automatically defeat a creditor's claim of constructive trust under New York law if otherwise required by equity. *In re Koreag, Controle et Revision, S.A.,* 961 F.2d 341, 353–54 (2d Cir.1992). Rather, a constructive trust may be imposed whenever necessary "to satisfy the demands of justice...." *Id.* "As with fraud, a constructive trust may be imposed on property obtained by bad faith." *In re Commodore Business Machines, Inc.,* 180 B.R. 72, 79 (Bankr.S.D.N.Y.1995).

166.     '[A] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " *Simonds v. Simonds,* 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978) (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378 (1919) (Cardozo, J.)); *see* 106 N.Y.Jur.2d Trusts § 162 (1993) ("a person may be deemed to be 'unjustly enriched' if he has received a benefit, the retention of which would be unjust").

167.     Constructive trusts have been imposed in a variety of situations where equity had dictated such a remedy. *See, e.g., Golden Budha Corp. v. Canadian Land Co. of America,* 931 F.2d 196, 202 (2d Cir.1991) (cause of action stated against party allegedly in possession of converted treasure trove); *Latham v. Father Divine,* 299 N.Y. 22, 29, 85 N.E.2d 168 (1949) (constructive trust imposed where fraud, duress or undue influence prevented testatrix from executing a will bequeathing property to others). *Counihan v. Allstate Ins. Co.*, 194 F.3d 357 (2d Cir. 1999) (we impose a constructive trust where the holder of legal title should not, in good conscience and equity, retain the benefits derived from such title); *Security Pac. Mortgage and Real Estate Servs., Inc. v. **363** Republic of the Philippines,* 962 F.2d 204, 210 (2d Cir.1992) (we have no hesitation in finding that the circumstances revealed here call for "the imposition of a constructive trust under the 'equity and good conscience' rule").

168.     Here, it is more than evident and proven that the monies and assets stolen from Plaintiff were laundered, intermingled with Defendant Malofeev's other income, and ultimately deposited among the $5,379, 876.94 in an account at Sunflower Bank, N.A. Acc. No. 1101996560 (the "Malofeyev Account"). Because these funds were derived directly or indirectly from Defendant Malofeev's racketeering activities aimed to divest Plaintiff, an alien residing in the United States, of his monies and assets, they are thus subject to a constructive trust.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter an order:

(1)      Subjecting $5,379,876.94 in United States Currency formerly deposited in Sunflower Bank, N.A. account 1101996560, held in the name of "OFAC blocked account Malofeyev" to the imposition of a constructive trust;

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all triable issues herein.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated April 13, 2023                              Respectfully submitted

By /s/ _____

Evgeny Ryzhov
E.Ryzhov@yahoo.com
+7(910) 797 1688
250 174th apt. 1918,
Sunny Isles Beach, FL 33160

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court email and that a true and correct copy of the foregoing will be served along with the summons and complaint to Defendants.

By /s/

Evgeny Ryzhov